In re PACIFIC MAIL S. S. CO.

(Circuit Court of Appeals, Ninth Circuit. May 2, 1904.)

No. 1,035.

1. SHIPPING—LIMITATION OF LIABILITY FOR SINKING OF VESSEL—INCOMPETENCY OF CREW.

Under Rev. St. § 4463 [U. S. Comp. St. 1901, p. 3045], which requires every steam vessel carrying passengers to have in her service a full complement of licensed officers and full crew sufficient at all times to manage the vessel, as well as by the general maritime law, the crew must not only be sufficient in numbers, but competent for all the duties they may be called on to perform in any exigency that is likely to happen, and unless such a crew is supplied the owners are not entitled, under section 4493 [U. S. Comp. St. 1901, p. 3058], to a limitation of liability under section 4283 [U. S. Comp. St. 1901, p. 2943] for damages to persons and baggage growing out of the loss of the vessel.

¶ 1. Limitation of liability of shipowners, see note to The Longfellow, 45 C. C. A. 387.

**2. SAME.**

The passenger steamer City of Rio de Janeiro on her return voyage from Hongkong and intermediate ports struck on a sunken rock outside San Francisco in a fog and darkness, and sank in 20 minutes thereafter, carrying down a large number of her passengers and crew. She carried eleven lifeboats, all of which should have been launched in five minutes, but only three were launched at all, and two of those were swamped by improper handling. The crew were sufficient in number, but were Chinese, and only two were able to understand the language spoken by the officers, who were white men, and they had never been drilled in launching the lifeboats. *Held*, that the vessel was not manned by an efficient and competent crew, such as it was the duty of the owners to provide; that the insufficiency of the crew was the paramount cause of the damages to persons and baggage; and that such owners were not entitled to a limitation of liability for damages to persons and baggage arising from the sinking of the vessel.

Appeal from the District Court of the United States for the Northern District of California.

See 126 Fed. 1020.

William Denman, R. P. Henshall, Gavin McNab, Thomas & Gerstle, W. P. Humphrey, R. H. Countryman, W. H. Willitt, Chickering & Gregory, R. H. Cross, Bien & Jackson, A. Morgenthal, Corget & Goodwin, Charles E. Snook, and Roger Johnson, for claimants.

Charles Page and Ward McAllister, for Pacific Mail S. S. Co.

William Denman, for Kate West et al.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

ROSS, Circuit Judge. The steamship City of Rio de Janeiro, whose home port was San Francisco, on entering the Bay of San Francisco on the 22d day of February, 1901, on one of her return trips from Hongkong and intermediate ports, struck a reef of rocks near the Golden Gate, and within 20 minutes sunk beneath the waters, carrying down a large number of her passengers and crew and all of her cargo. Shortly thereafter, to wit, March 19, 1901, the Pacific Mail Steamship Company, owner of the ship, filed in the court below its petition for limitation of liability, alleging therein that the sinking of the ship occurred by reason of the perils of the sea, and praying for a limitation of liability, and for the privilege of contesting any liability for the losses that occurred. The court below directed a reference to its commissioner to ascertain and report the value of the ship and freight pending. Evidence was taken showing the amounts collected by the petitioner on the ship's outward voyage for passage money and freight and the amount received and agreed to be paid upon the return voyage. In respect to the question of freight pending it was shown that all goods lost had been shipped under bills of lading containing these provisions:

"Freight for the same to be paid in United States gold coin, said freight to be considered earned, steamer or goods lost or not lost at any stage of the entire transit. * * * The foregoing bill of lading is issued subject to the terms and conditions of an act of Congress of the United States of America, approved February 13, 1893, entitled 'An Act relating to Navigation of Vessels, Bills of Lading, and to certain obligations, duties and rights in connection with the carriage of property,' (Acts of 52d Congress, 2d Session, page 445,

Chap. 105,) the provisions of which are hereby made a part hereof, and are deemed to control and express the contract of the parties hereto in all cases where there may be (if there be any such cases) a difference between the expressed provisions of the bill of lading and the terms of such Act of Congress."

Based upon evidence introduced before the commissioner, that officer reported to the court findings to the effect that the petitioner was, and still is, the sole owner of the steamship, the value of which, in its wrecked condition, was $150; that the voyage which terminated in the wreck and loss of the ship began at Hongkong, China, on the 22d day of January, 1901; that the freight money collected at Hongkong and way ports for the voyage to San Francisco, and that which was to have been collected at the latter place, "is earned and the freight pending in this cause," and appraising the value of the ship and her freight pending as follows:

Steamship City of Rio de Janeiro, and her tackle, apparel, machinery, and furniture ....................................... $   150 00
Freight and passage money pending....................... 24,827 93
                                                          ─────────
    Total ............................................... $24,977 93

The commissioner took no account of the freight or passenger money collected on the outward voyage of the ship.

To his report the claimant Sarah Guyon, administratrix of the estate of Henry Guyon, deceased, filed these exceptions:

"(I) Claimant excepts to the following finding of said report and appraisement: 'I do further find that the voyage which terminated in the wreck and loss of the aforesaid steamship at the entrance to San Francisco Harbor on the 22d day of February, 1901, began at Hongkong on the 22d day of January, 1901,' on the grounds: (a) That there is no evidence before the commissioner to show that the said voyage began at Hongkong, China. (b) That the evidence conclusively established that the voyage for which the freight was pending at the time of the said wreck began at San Francisco on or about December 14, 1900, and extended through the ports of Honolulu, Yokohama, Kobé, Nagasaki, Shanghai, to Hongkong, and return to San Francisco, touching at the same ports in the reverse order.

(II) Claimant excepts to the following finding: 'I do further find the freight and passage money pending for the aforesaid voyage to be the sum of $24,827.93,' on the grounds: (a) That the term 'aforesaid voyage' is ambiguous, and that it cannot be determined therefrom whether the said term applies to the voyage on which the City of Rio de Janeiro was wrecked or whether it refers to the portion of the voyage beginning at Hongkong January 22, 1901; claimant admitting the said sum to be the freight pending for the latter, but excepting to the said sum as a finding of the freight for the entire voyage. (b) That the evidence conclusively shows the freight pending for the voyage on which the City of Rio de Janeiro was wrecked to have been $55,412.95.

"(III) Claimant excepts to the following finding and appraisement: 'I do further appraise the value of the said steamship and her freight pending as follows:'

Steamship City of Rio de Janeiro, her tackle, apparel, and furniture ....................................... $   150 00
Freight and passage money pending....................... 24,827 93
                                                          ─────────
    Total ............................................... $24,997 93

—On the grounds: (a) That the evidence conclusively shows that the venture in which claimant was interested was the sending of the City of Rio de Janeiro on a voyage from San Francisco to Asiatic ports and return to carry for hire passengers, freight, and mails, and that the freight pending for the

portion of the voyage from San Francisco to Hongkong, amounting to $30,-202.11, should be added to the $24,827.97 earned on the homeward trip of the voyage; making the total appraisement for the freight pending $55,040.04. (b) That the evidence shows conclusively that the value of the ship after the wreck was $500, and that this sum should be included in the said appraisement. (c) That the appraisement of the said vessel should be amended as follows:

Freight pending for venture.................................. $55,040 04
Wreck $500.00; boats $150.00............,...................    650 00

Total ........................................... $55,690 04

"Wherefore claimant prays that the said exceptions to the said report and appraisement be allowed, and that the said appraisement be recommitted to the said commissioner, with instructions to amend the same by adding thereto the item of $30,212.11 as for freight pending for the outward trip of the voyage on which the said steamship sank, and the item of $500 as for the value of the ship after the wreck."

The petitioner filed the following:

"Petitioners except to the following finding of said report and appraisement: 'And that which was to have been collected at San Francisco.' Wherefore petitioners pray that the said appraisement be recommitted to the said commissioner, with instructions to amend the same by deducting the sum of $13,729.17 for freight which was to have been collected at San Francisco."

All of the exceptions were overruled.

Various claims having been filed for damage by reason of loss of life and for loss of goods, baggage, etc., the cause came on for trial before the court upon its merits. The court found and held that the sinking of the ship was not due to any peril of the sea, but to the gross negligence of her master and pilot; after which the petitioner moved for a reduction of the bond so far as it represented freight pending, which motion was denied.

In and by its final decree the court below awarded damages to various of the claimants who were representatives of lost passengers, or who had themselves suffered injury, in amounts aggregating $35,-125, but limited the liability of the petitioner for such damages to the sum of $24,977.93, with interest thereon from March 19, 1901, which sum, with interest, was directed to be paid into the registry of the court within 10 days, and to be apportioned among the various claimants to whom damages were so awarded after the payment out of such fund of all the costs of the proceeding except the cost incurred in the proceedings relating to the appraisement of the steamship and her freight pending, which the petitioner was directed to pay. The court held against the claims of Clara Barwick, and Ruth Miller as executrix of the estate of Sarah Wakefield, deceased.

From the decree various of the claimants, as also the petitioner, have appealed. The ground of the petitioner's appeal is that, inasmuch as the court below found and held that the loss occurred solely by reason of the negligence of the ship's officers, and not by reason of any peril of the sea, it erred in holding that pending freight included either any prepaid freight or prepaid passage money, or any uncollected and uncollectible or unearned freight, and that, instead of limiting the liability of the ship to $24,977.93, it should have been limited to the sum of $4,483.53, which latter sum, it is contended on

the part of the petitioner, is the aggregate amount of the value of the ship and her freight pending. The main ground of the appeal of those of the claimants whose appeal is from that portion of the final decree adjudging "that the liability of the Pacific Mail Steamship Company for said damages be and hereby is limited to the sum of $24,977.93 and interest thereon from March 19, 1901," is that the crew of the lost steamship "spoke and understood only the language of a race and nation different from the officers immediately in command over them in the launching of the lifeboats on said vessel, and that they could not speak or understand the commands of said officers, and that they had never been drilled in the launching of the lifeboats to train them to launch the same without commands, and that the said crew was therefore not sufficient at all times to man said steam vessel carrying passengers, and that the injury to claimants arose from said insufficiency," and "that the officers of said City of Rio de Janeiro in command of her eleven lifeboats could not speak any language which the members of the crew immediately under their command in launching said boats could understand, which said crew had not been trained in launching said boats, and therefore that said Pacific Mail Steamship Company has not supplied a full complement of officers sufficient at all times to manage a steam vessel carrying passengers, and that the injuries to the claimants arose through said insufficiency."

It is apparent that, if this position of the claimants is well founded, the petitioner is not entitled to any limitation of its liability, the questions presented on its appeal become immaterial, and the claimants to whom damages were awarded by the court below will be entitled to judgment for the full amounts so awarded them, together with their costs, whether the voyage on which the disaster occurred should include the round trip from San Francisco to Hongkong and back, as contended on the part of the claimants, or is limited to the return trip from Hongkong to San Francisco, as contended on the part of the petitioner. The record shows that the disaster occurred about half past 5 o'clock of the morning of February 22, 1901. The fog was so dense that the day afforded no light. It was very dark, but the water was smooth, and there was but little, if any, list to the ship as she sank, which she did in 20 minutes from the time of striking the rocks. She carried 211 persons and 11 lifeboats, 3 of which were swung by davits from the sides of the ship, and 8 of which were on skids on the roofs of the deckhouses. Their equipment and the apparatus for launching them was good. The evidence is that under such conditions five minutes was ample time for the lowering of the boats. It further shows that there was no panic among the passengers or crew; that the passengers behaved well; and that the captain, immediately upon the ship's striking the rocks, sounded the alarm, and called the crew to the boats. Each of the boats was commanded by a white officer, and manned by a part of the Chinese crew. Yet but three of the eleven boats were lowered into the water, one of which (the aft quarter boat No. 10) was lowered by Officer Coghlan and the ship's carpenter, and but three of the hundred and odd passengers that the ship carried were taken into any boat. There

must, in the very nature of things, have been some paramount, controlling cause for all this. And that cause, we think, is very easily to be seen. It was not merely for the reason that the men depended upon to man the boats were Chinese. To the contrary, the evidence is that the Chinese make excellent sailors. We extract the following from the testimony of Capt. Seabury, a most competent and experienced mariner, and who, at the time of giving his testimony in this cause, had completed his sixty-fifth round voyage from San Francisco to the Orient for the petitioner:

"A. Every time I have been to sea on this side of the continent, and every time I have had a white crew, we have always had trouble with them getting drunk; especially sailing days. At times at sea—when I ran to Australia, where I made five voyages—twice we had a white crew, and there was scarcely a day but I did not have to go to the police court on account of some row that they made. I have always found the Chinese crew obedient, able to do their work, and always on hand in bad weather, and not eyeservants. You do not have to watch them in the ordinary run of work. Q. During those sixty-five voyages, Captain Seabury, have you ever encountered any typhoons? A. Yes, sir; two or three. Q. And any bad weather? A. Yes, sir; I had a very bad one last September. Q. At the time did you have a Chinese crew? A. Yes, sir; on this same ship. Q. How did they behave in time of peril? A. As well as any men could possibly behave. They never stow away in dark nights in bad weather. They are always right there, and you can always make sure of them. Q. Have you ever seen them in time of wreck? A. I never have been wrecked, not since I have been steamshipping. I have in sailing schooners. We had pretty nearly a wreck on the Alaska in 1879, and had to turn back. Q. With a Chinese crew? A. Yes, sir. Q. Did they behave well? A. Yes, sir. Q. How many men have you on the China now in your crew? By the word 'crew' I mean sailors. I do not mean men in the steward's department, or men in the steerage department, or men in the fireroom. I mean crew—sailor men. Mr. Denman: I object to the question as incompetent, irrelevant, and immaterial, and in no way referring to the City of Rio de Janeiro, the ship in issue. A. Thirty-two. Mr. McAllister: Q. Thirty-two men? A. Yes, sir. Q. Can any of those men speak English? Mr. Denman: The same objection. A. All of them can speak English. Some cannot speak quite so well as others, but all of them can understand when you give them an order about the ship. Mr. McAllister: Q. Can you give to a majority of that crew yourself an order in English to haul this rope, or do this or that, whatever you saw fit? A. Yes, sir. Q. And would they understand you? A. Yes, sir."

But how about Chinese sailors, or sailors of any other class or race, who cannot understand the orders that become necessary in the course of their duties because of a lack of knowledge of the language in which they have to be given? That is the question we have to consider and determine here.* It is declared by section 4463 of the same statutes [U. S. Comp. St. 1901, p. 3045] that:

"No steamer carrying passengers shall depart from any port unless she shall have in her service a full complement of licensed officers and full crew, sufficient at all times to manage the vessel, including the proper number of watchmen. But if any such vessel is deprived of the services of any licensed officer,

---

*Section 4493 of the Revised Statutes of the United States provides that "whenever damage is sustained by any passenger or his baggage from explosion, fire, collision, or other cause, the master and the owner of such vessel, or either of them, and the vessel, shall be liable to each and every person so injured, to the full amount of damage if it happens through any neglect or failure to comply with the provisions of this title, or through known defects or imperfections of the steaming apparatus or of the hull. * * *"

130 F.—6

without the consent, fault, or collusion of the master, owner, or any person interested in the vessel, the deficiency may be temporarily supplied, until others licensed can be obtained."

It is, as was said by Judge Hawley in Re Meyer (D. C.) 74 Fed. 885, "the duty of the owners of a steamer carrying goods and passengers, not only to provide a seaworthy vessel, but they must also provide the vessel with a crew adequate in number, and competent for their duty with reference to all the exigencies of the intended route"; not merely competent for the ordinary duties of an uneventful voyage, but for any exigency that is likely to happen, such, for example, as unfortunately did happen in the present case—the striking of the ship on a reef of rocks—and the consequent imperative necessity for instant action to save the lives of passengers and crew. The duty rested upon the petitioner to be prepared for such an emergency, not only by reason of the statute cited, but by the general maritime law. In the case of The Bark Gentleman, Olcott, 115, Fed. Cas. No. 5,324, it was held that the owners were liable for furnishing an inadequate crew, which they shipped at the Gambia river, West Africa, large enough in numbers, but sick with fever. In Tait v. Levy, 14 East, 482, it was held that, where the captain did not know the coast, and entered the enemy's port, and was captured, the vessel was "incompetently fitted out," because there was no proper master for the purpose of the voyage. In Parsons v. Empire Transportation Company, 111 Fed. 202, 208, 49 C. C. A. 302, we held that, where the owners appointed an incompetent superintendent to manage ships in Alaskan waters, they were not entitled to a limitation of liability for loss arising from sending out a barge in wintry and stormy weather. There can, in our opinion, be no doubt that the crew of a ship must be not only sufficient in numbers, but also competent for the duties it may be called upon to perform. The case shows that the City of Rio de Janeiro left the port of Honolulu, on the voyage under consideration, with a crew of 84 Chinamen, officered by white men. The officers could not speak the language of the Chinese, and but two of the latter—the boatswain and chief fireman—could understand that of the officers. Consequently, the orders of the officers had to be communicated either through the boatswain or chief fireman, or by signs and signals. So far as appears, that seems to have worked well enough on the voyage in question, until the ship came to grief, and there arose the necessity for quick and energetic action in the darkness. In that emergency the crew was wholly inefficient and incompetent, as the sad results proved. The boats were in separate places on the ship. The sailors could not understand the language in which the orders of the officers in command of the respective boats had to be given. It was too dark for them to see signs (if signs could have been intelligibly given), and only one of the two Chinese who spoke English appears to have known anything about the lowering of a boat; and there had been no drill of the crew in the matter of lowering them. Under such circumstances it is not surprising that but three of the boats were lowered, one of which was successfully launched by the efforts of Officer Coghlan and the ship's carpenter, another of which was swamped by one of

the Chinese crew letting the after fall down with a run, and the third of which was lowered so slowly that it was swamped as the ship went down. We have no hesitation in holding that the ship was insufficiently manned, for the reason that the sailors were unable to understand and execute the orders made imperative by the exigency that unhappily arose, and resulted so disastrously to life, as well as to property. It results from what has been said that the court below also erred in denying the appellant Clara Barwick's claim made on her own behalf and that of her minor children, for damages for the death of her husband, on the ground that he was a fellow servant of the master and.pilot of the ship.

The action of the court in respect to the claim of Ruth Miller, executrix of the estate of Sarah Wakefield, deceased, was, in our opinion, correct.

The judgment is reversed, and the cause remanded, with directions to the court below to enter judgment against the petitioner denying its application for a limitation of liability, and in favor of the respective claimants for the full amount of damages it has heretofore awarded them, with interest and costs, and in favor of the claimant Clara Barwick for such amount of damages as the court shall find from the evidence already taken, or that may be taken, she is entitled to by reason of the death of her husband, and by reason of the loss of his personal effects; and against the claim of Ruth Miller, as executrix of the estate of Sarah Wakefield, deceased, in so far as it is based upon her death.