## THE NORDPOL.

### THE CONDOR.
### Nos. 418–422.

Circuit Court of Appeals, Second Circuit.
June 15, 1936.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (W. H. McGrann and H. B. Finn, both of New York City, of counsel), for appellant.

**4**

Bigham, Englar, Jones & Houston, of New York City (T. Catesby Jones and W. J. Nunnally, Jr., both of New York City, of counsel), for appellee Albert Jensen Anderson, master and claimant of the motorship Nordpol.

Bailey & Muller, of New York City (Theodore L. Bailey and William H. Woolley, both of New York City, of counsel), for appellee Anglo-Chilean Nitrate Sales Corporation.

Before MANTON, L. HAND, and AUGUSTUS N. HAND, Circuit Judges.

MANTON, Circuit Judge.

The American Steamship Condor, owned and operated by the Grace Steamship Company, is a passenger and cargo vessel, 380 feet long, 53 feet in beam, gross tonnage 4,747, having a speed of 10 knots per hour. The Danish motorship Nordpol is a cargo carrying vessel 380.8 feet long, 53.9 feet in beam, gross tonnage of 5,885, equipped with twin screws and having a speed of 11 knots.

The Condor was on a voyage from San Francisco, Cal., to South American ports. She left Arica, Chile, November 15, 1930, at 2 p. m. bound northward for Buenaventura, Colombia, with cargo and passengers. Her course was 301° true, laid to pass Coles Point 10 miles off shore, and her speed was about 10 knots. The Nordpol, with cargo, left Mollendo, Peru, at 4 p. m. the same day, southbound for Arica, and proceeded on a course S. 34° E. (146° true) at a speed of 11 knots and also expecting to pass Coles Point about 8 or 10 miles distant. The weather was clear with excellent visibility. The vessels sighted each other at least 25 minutes before the collision, which occurred about 9:30 p. m. Approaching each other on crossing courses, the Nordpol had the Condor off her port bow. The Condor failed to keep out of the way of the Nordpol, but shifted her course to 290° true 20 minutes before the collision. Immediately prior to the collision, the Condor, without warning or signal, suddenly turned to the westward and veered sharply across the course of the Nordpol. The Nordpol immediately reversed her engines and was put hard to starboard. The vessels could not clear and the Nordpol rammed the Condor.

The court below found, upon ample evidence, that the Condor was at all times off the Nordpol's port bow with only her green light showing; that the Nordpol was seen by the Condor at least as early as 25 minutes before the collision; that five minutes later the Condor's course was changed 10° to port, and within a few minutes of the collision it was again turned sharply to port directly across the bow of the Nordpol. This maneuver is charged to the helmsman, a Peruvian, who, it is claimed, misunderstood the order given in English by the navigator of the Condor. This helmsman spoke Spanish only. Instead of giving the ship hard right rudder when he received the order hard-a-port, he gave her hard left rudder. This was the finding of the court below and it was justified by the evidence.

The Nordpol kept her course and speed up to just before the collision. Then she was put hard to starboard (direct order) and her engines reversed. The evidence shows that the Nordpol was then unable to swing clear of the Condor and avoid the collision. The Condor's sudden movement across her bow had been without warning. Under the circumstances, the fact that the Nordpol turned to starboard in the general direction that the Condor was proceeding does not preclude a finding that she was free from fault. The attempt was made as a possible escape from collision and for the purpose of minimizing the damage, in any event. When Officer Thuroe saw the approaching steamer suddenly turn hard to port just ahead of the bow of the Nordpol, he was faced with an emergency and met it by immediately putting his helm hard to starboard and reversing both the engines full speed astern. Due to the high speed, a collision was unavoidable. Because of the mention, in some of the evidence, of a mile as the distance apart when this maneuver by the Nordpol was undertaken, criticism of the Nordpol is made. However, there was evidence to support the lower court's finding that this mention of a mile was merely an estimate and as a matter of fact the vessels were much closer. We are satisfied with this resolution of the apparent conflict in the evidence and agree that as soon as it became apparent that the collision could not be avoided by the Condor alone, the Nordpol properly then attempted to escape.

We think this was compliance with the Nordpol's obligations under the rules

and that the Condor is to be condemned for violating the starboard hand rule. Article 19 of the International Rules (33 U.S.C.A. § 104). Although the privileged vessel is required by rule to keep her course and speed, there may come a time when the privileged vessel is required to take action. Article 21 of the International Rules (33 U.S.C.A. § 106) provides: "Note—When, in consequence of thick weather or other causes, such vessel finds herself so close that collision cannot be avoided by the action of the giving-away vessel alone, she also shall take such action as will best aid to avert collision." Such navigation has been approved by judicial authority. See The New York, 175 U.S. 187, 206, 20 S.Ct. 67, 44 L.Ed. 126; The Devonian (D.C.) 110 F. 588. Moreover, if error was made in the conclusion to change the course of the Nordpol, it was an error in extremis which is not chargeable as a fault. Wilson v. Pacific Mail Steamship Company, 276 U.S. 454, 48 S.Ct. 369, 72 L.Ed. 651; The Maggie J. Smith, 123 U.S. 349, 8 S.Ct. 159, 31 L.Ed. 175; The Steel Inventor, 43 F.(2d) 958 (C.C.A.2); The Lafayette, 269 F. 917 (C.C.A.2). The Condor was properly held solely at fault for this collision.

■ The appellant argues that it was error to refuse the Condor exemption from liability for cargo damages under the provisions of the Harter Act [Feb. 13, 1893, c. 105, § 3, 27 Stat. 445, 46 U.S.C.A. § 192]. For such exemption the Condor was under the burden of establishing seaworthiness or due diligence in making the ship seaworthy at the commencement of the voyage. The Wildcroft, 201 U.S. 378, 26 S.Ct. 467, 50 L.Ed. 794; International Navigation Co. v. Farr & Bailey Mfg. Co., 181 U.S. 218, 21 S.Ct. 591, 45 L.Ed. 830. The Harter Act (46 U.S.C.A. §§ 190–195) deprives cargo owners of rights formerly had by the maritime law. It has been strictly construed, and in order to have the advantage of its provisions the burden of proof has been placed on the vessel owner to show affirmatively that he has complied with all the conditions and exercised due diligence to make the vessel in all respects seaworthy, properly manned, equipped, and supplied prior to and at the commencement of the voyage at the port where the cargo was loaded. In this instance, the cargo was loaded at Tocopilla, Chile, on November 13th. While there is testimony of a general character of the Condor's condition at San Francisco, Cal., eight weeks before the cargo was loaded, there is no testimony as to her condition at the commencement of the voyage with this cargo. Moreover, there is testimony that at Arica and at the time of the collision, as the master testified, tests were made of the steering gear, engines, whistles, telegraph, and speaking tubes, and they were in A—1 condition. There is no testimony, however, as to supplies and other equipment at any place. A vessel may exempt itself from liability under section 3 of the Harter Act (46 U.S.C.A. § 192) only upon such proof. May v. Hamburg-Amerikanische Packetfahrt Aktiengesellschaft, 290 U.S. 333, 54 S.Ct. 162, 78 L.Ed. 348; The West Arrow, 80 F.(2d) 853 (C.C.A.2).

■ On October 13, 1930, at Callao, Chile, the vessel had engaged Barreda, an able-bodied seaman, a helmsman who spoke Spanish but not English, without a certificate or sanction of the United States Consul at that port, which was a violation of section 4517 of the Revised Statutes (46 U.S.C.A. § 570). There was no evidence as to whether or not the consul's sanction was sought or refused. But appellant contends that the consul's office was closed when the vessel sailed. However, the vessel was in the port of Callao two days. There were desertions from the crew and it became necessary to take on other seamen. However, the Grace Company, in employing Barreda, who neither understood nor spoke English nor had had experience with the American indirect helm orders, had failed to properly man the ship and thus she was not seaworthy. Section 3 of the Harter Act (46 U.S.C.A. § 192) would relieve the owner of this vessel from liability only if it exercised due diligence to make the vessel in all respects seaworthy and properly manned. Barreda was hired to take a regular turn at the wheel. He was obviously incapable of performing this duty properly. The fault was in taking on a man so incompetent in his anticipated work, and in this degree, diligence in making the ship seaworthy was lacking. In re Pacific Mail S. S. Co., 130 F. 76, 69 L.R.A. 71 (C.C.A.9); U. S. v. Charbonnier, 45 F.(2d) 174 (C.C.A.4).

The decrees are affirmed.