Matter of the Petition of AMERICAN DREDGING COMPANY, as owner of THE ARTHUR N. HERRON, for exoneration from or limitation of liability.

No. 137 of 1953.

United States District Court
E. D. Pennsylvania.
Jan. 19, 1956.

Abraham E. Freedman, Freedman, Landy & Lorry, Philadelphia, Pa., for claimants.

Thomas E. Byrne, Jr., Krusen, Evans & Shaw, Philadelphia, Pa., for American Dredging Co.

KIRKPATRICK, Chief Judge.

On the evening of November 18, 1952, between 10:00 and 11:00 o'clock, the tug Arthur N. Herron was going down the Schuylkill River, with a tow consisting of a loaded mud scow made up on her port side. As she was passing the refinery of the Gulf Oil Company, the men on board her heard a rumbling sound and, without other warning, the surface of the river around the tug suddenly burst into flames, enveloping the tug and barge in a sea of fire, with flames rising to a height far above the deck of the tug and completely shutting off the view of those on board in every direction. The tug caught fire and portions of it, including the entire wheelhouse, were destroyed.

Two men lost their lives. Their widows, together with at least one of the crew who suffered burns in the fire, have claims for damages against the American Dredging Company, owner of the tug. The matter comes before the Court upon a petition for exoneration from or limitation of liability filed by the Dredging Company.

In proceedings of this nature, the burden of proof is upon the petitioner. If he can show that the disaster was due to no fault of his and no fault on the part of the ship or its crew, he is entitled to exoneration. If he fails to meet this burden or if it appears affirmatively that there was negligence, causing or contributing to the loss, on the part of the master or crew, the limitation phase comes under consideration, and here, fault having been proved, or presupposed from the petitioner's having asked for limitation, the petitioner's burden is to show that the fault was without his privity or knowledge.

The cause of the fire was the ignition of highly inflammable vapor lying above an extensive accumulation of some petroleum product spread over the surface of the river, which was touched off by an open flame kerosene lantern carried on the deck of the scow at its rear port corner.

The lantern was not more than three feet above the water instead of eight feet as required by Section 80:16, subsection (h)[1], of the Coast Guard Regulations, and there is evidence, consisting of expert opinion, that the vapor would not have been ignited if the lantern had been carried at a height of eight feet. However, that fact being an element of liability in this case, the claimants were not bound to prove it, but the petitioner had the burden of disproving it, and has failed to do so.

The petitioner contends that section (h) does not cover the case of a barge or scow towed alongside, as was the one which the Herron was towing, but I think that it does. Subsection (e) also deals with alongside tows but ex-

---

than eight feet above the surface of the water.

pressly applies only to such barges as have deck houses or which are carrying cargo piled so high as to obscure the side lights of the tug. In such case the barges must carry on their outward sides red or green lights corresponding to the light of the tug obscured by the tow, but need not carry any white light.

Subsection (h) applies to scows "not otherwise provided for". Alongside tows without obstructing structures or cargo on them are not provided for in section (e) or anywhere else. The mud scow involved in this case had nothing on it except its low-lying cargo of mud, hence, subsection (e) did not apply to it and subsection (h) did.[2]

 However, I am of the opinion that the violation of the Coast Guard regulation in respect of the height at which the lantern was carried does not constitute negligence per se, nor is it evidence of negligence. "A statute or ordinance may be construed as intended to give protection against a particular form of harm to a particular interest. If so, the actor cannot be liable to another for a violation of the enactment unless the harm which the violation causes is that from which it was the purpose of the enactment to protect the other." Restatement, Negligence, Section 286h, page 756. " * * * if none of the consequences which the statute or ordinance was intended to guard against has ensued from its violation, such violation does not amount to negligence, even though some other injurious consequence has resulted; but in such case the liability, if any, must rest solely on common-law negligence." 65 C.J.S., Negligence, § 19, p. 423.

It seems to me to be beyond all question that the Coast Guard regulation had to do solely with navigation and was intended for the prevention of collisions, and for no other purpose. In the present case there was no collision and no fault of navigation. True, the origin of the fire can be traced to the violation of the regulation, but the question is not causation but whether the violation of the regulation, of itself, imposes liability. There seems to be no disagreement among authorities that it does not.

The same considerations apply to unseaworthiness. Whether the violation of the regulation be called negligence or be said to make the flotilla unseaworthy is merely a question of words. In either case the liability stems exclusively from the violation of a regulation designed for a specific limited purpose and in either case the injury was of a kind not contemplated or intended to be guarded against by the regulation.

 This brings us to the question whether, apart from any question of failure to observe a regulation, there was common-law negligence or unseaworthiness under the general maritime law. The lanterns carried were open flame kerosene lights of a proper and suitable type. It is true that the Schuylkill River has on its banks several refineries and facilities for oil storage and for loading and unloading petroleum products; but there is no evidence that the river at this point is, or ever has been, considered a danger area, so that it would be negligent for a ship to carry open flame lanterns at a height of three feet above the water, and I find that there was no negligence in doing so. It should be noted that not only are open lights carried, but

2. I cannot accept the petitioner's interpretation of the regulation, which, if carried to its conclusion, would mean that a low-lying barge would not have to carry any light at all. Nor does the testimony of the Coast Guard Chief of Marine Safety for the district support the petitioner's view. There was no evidence of recognition by the Coast Guard of, or its acquiescence in, any practice relating to lights on barges, the fact being that the Coast Guard never made

any attempt to enforce any of the regulations relating to lights and imposed no penalties until after a collision or a violation had been reported. The only thing which could possibly be taken as an interpretation by the Coast Guard was the witness's advice to some tugboat owners that subsection (h) applied to barges towed alongside and required two white lights. There was nothing said about the height at which the lights were to be carried.

internal combustion as well as steam engines are used, vessels and tugs have galleys, men smoke aboard the boats and, in addition, many small boats with open lights ply up and down the river. Beside this, the Penrose Avenue bridge with a constant stream of automobiles and pedestrians passing over it spans the river at a point very near that of the accident.

Although I have not predicated liability upon it, it does appear as a fact that there was a violation of a regulation pertaining to lights, and I think that, inasmuch as the case may be appealed, the claimants are entitled to a finding as to the knowledge and privity on the part of the petitioner. Upon this issue, like the other issues, the burden is upon the petitioner to disprove, rather than upon the claimants to prove. The petitioner called one of its captains who was in charge of the tug part of the time and who testified that there was a supply of eight-foot steel rods with lantern arms on board. He, like Captain Taylor, never used them when towing a single barge alongside. In view of the length of time during which the tug had been operating, and the number of trips up and down the river it must have made, it is not improbable that the petitioner was aware of the fact that the poles were not used. The petitioner was not an absentee owner but was in the towing business conducting it actively and daily on the Schuylkill River and in the port of Philadelphia. However, still bearing in mind the petitioner's burden, the significant thing is that no officer or employee of the petitioner appeared who denied such knowledge or the opportunity to obtain it. I, therefore, find that the petitioner had knowledge of the statutory violation and was privy to it.

The questions of Captain Taylor's competency and whether or not his conduct during the emergency constituted negligence contributing to the injury remain to be considered.

In critically appraising Captain Taylor's conduct, one should remember that one is attempting to judge a man instantaneously and without warning plunged into a situation of danger of a kind almost unique in peacetime navigation. This was not the case of a fire breaking out on board—even a swiftly spreading fire. Proceeding along a quiet river, the crew of this tug suddenly, probably in less than a second, found themselves practically in the heart of a furnace. The entire episode, from the first burst of fire until the flames died down to patches on the surface of the river, covered in time not much more than five minutes.[3]

■ At the time when the fire began, Captain Taylor was not in the pilot house, having gone to the galley to get a cup of coffee, leaving the wheel in charge of one of the deckhands. The claimants contend that this was negligent, inasmuch as a number of tankers were loading or discharging at the plant of the Gulf Company, showing red lights, indicating that they were handling inflammable or explosive cargo. I do not see how that fact can make the part of the river on which the tug was navigating a "danger area", as the claimants contend. At the time the captain left the bridge, the nearest of the tankers was more than 3400 feet away from the tug, or, in time, something between five and ten minutes. He could have got back to the pilot house in a matter of seconds, and there is no evidence that he was in the galley more than a very few minutes. I cannot see that there was the slightest reason to anticipate any danger from the ocean-going tankers at the Gulf spillways.

■ Nor can I find negligence in Captain Taylor's maneuvering of the tug after the fire started. What he did was

3. Norcross's testimony does not, as the claimants contend, establish the fact that it was a matter of only a minute or so. Norcross's estimate began with the time when his attention was drawn to a glow in the sky, but there is nothing to show that the glow would not have been seen by him before that, had he been looking in that direction.

to order the engine stopped, then reversed, and finally, when it seemed to him (as well as to everyone else on board) that the tug was doomed, stop again, with the idea in mind that it would make it safer for the men to jump off from the stern. I do not agree that stopping and backing was wrong. The captain had no idea how great an area of the river was on fire or how far he would have to drive through the flames if he went straight ahead, and it appeared to him that the fire was not quite as solid astern as it was ahead. I cannot accept the theory of the claimant's expert that this slow-moving tug and barge, if steered straight ahead, would have created a bow wave sufficient to more or less insulate it from the burning surface of the water. Besides, the captain knew that there was nothing directly behind him, and he was unable to see what was ahead of him, so that if he drove ahead there was always the possibility of running his flaming tug into another vessel or a pier or some part of the Gulf Refinery's shore structures. The final stop may have been a mistake but, right or wrong, it was an exercise of judgment in an unprecedented situation and I cannot find negligence in connection with it.

The next point raised by the claimant is that it was negligent to fail to make use of the hose or other firefighting apparatus. Closely related to this is the point that the failure to do so was attributable to the fact that no fire drills had ever been held.

The purpose of fire drills is to condition the master and crew to react automatically and immediately to a situation of emergency so that when a fire breaks out the hose and equipment can be put into use without delay. Unquestionably, Captain Taylor was negligent in failing to hold periodic fire drills and it could properly be said that this rendered the ship unseaworthy. Certainly, that was an omission which cannot be excused upon the grounds of the sudden emergency with which the captain was faced. However, I am convinced that his negligence and the tug's unseaworthiness, due to the crew's lack of training in this particular, could not have had anything to do with the loss, for the reason that there never was the slightest chance of making any effective use of the equipment.

Of course, the bursting into flame of the surface of the water can be properly described as a fire, but it came closer to being an explosion than any ordinary fire. There was literally nothing for the men to do but run to the engineroom and close the hatches. The heat outside must have been humanly insupportable. The testimony is that at ship's side the temperature was 1800 to 3800 degrees Fahrenheit. None of the men were able to stay on the deck much over half a minute. Captain Taylor testified "Well, it was just like a furnace. You couldn't stand out on deck that long to find out how hot it was. It was just like a large blowtorch, it seemed like to me." Bugoski, the oiler, who was in the engineroom looking out a porthole, said "I felt a hot flash hit me right in the face", and Harrington, a deckhand, described the flames as so high that he could not see the top of them. At one time when the men were in the engineroom, Captain Taylor attempted to get onto the barge but was driven back "as soon as I opened the port door, and the flames shot right in my face. * * * I had to close the door right away." This, it may be noted, was on the port side, partially, at least, protected by the barge. I conclude that, even with a perfectly trained crew, no one could have remained on the deck of the tug, or even on the barge, long enough to have used the fire hose with any appreciable effect before it went out of commission. Obviously, if this is so, the lack of fire drills was not a factor in the loss.

I cannot fix blame upon the captain for failing to rescue Worrell or Mylan. Mylan was in the engineroom with him. The place was filled with stifling, oily smoke and it was impossible for one man to identify another. All that could be seen were dim figures. As a matter of fact, the evidence indicates that Mylan

did not remain in the engineroom but jumped overboard with the others when the tug was abandoned. It was plainly impossible to get to Worrell in the wheelhouse.

There are a number of other things which it is argued that the captain should have done. I do not think it is necessary to go into detail, and I shall only say that I do not find any negligence in any of them on the part of the captain or, at least, any negligence which caused or contributed to the loss.

■ There is no dispute about the principle of law, on which another branch of the claimant's case is grounded, namely, that the owners of a vessel, as part of their warranty of seaworthiness, are bound to provide a competent master for the vessel. "Applied to a seaman, such a warranty is, not that the seaman is competent to meet all contingencies; but that he is equal in disposition and seamanship to the ordinary men in the calling", Keen v. Overseas Tankship Corp., 2 Cir., 194 F.2d 515, 518. This statement of the law, of course, includes masters of vessels as well as ordinary seamen, the only difference being that the master's abilities must measure up to those of the ordinary master of a similar vessel, in this case the ordinary tugboat captain.

■ The claimants contend not only that the petitioner has failed to meet the burden of showing Captain Taylor's competency but the evidence clearly discloses his incompetency. Although only 26 years old at the time of the accident, Captain Taylor had five years experience as a tugboat captain in the port of Philadelphia. From the time he was 16 years old he had been working on and about ships of various kinds. This, I think, is prima facie evidence that he was a competent officer and is sufficient to meet the petitioner's burden. The claimants produced no evidence of anything in Captain Taylor's past record unfavorable to him or his seamanship. They rely entirely upon their position that his conduct immediately before and during the emergency sufficiently proves that he was an incompetent ship's officer, and they invoke the principle of Boudoin v. Lykes Brothers Steamship Co., Inc., 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354. That was a far-reaching decision, and it follows from it that if the evidence is strong enough, an officer can be found, from his handling of a single situation, to have been incompetent, and the Court can make a finding that his employment was a breach of the warranty of seaworthiness, without proof of anything else—either of his record as a seaman, his background, his training or his personal qualities.

The precise standard of seamanship required as laid down in the decisions should be carefully borne in mind. In In re Pacific Mail S. S. Co., 9 Cir., 130 F. 76, 82, 69 L.R.A. 71, quoting the opinion in In re Meyer, D.C., 74 F. 881, 885, the Court noted that the crew must be adequate and competent " 'with reference to all the exigencies of the intended route'; not merely competent for the ordinary duties of an uneventful voyage, but for any exigency that is likely to happen, * * *". Is it evidence from which it can be found that the master of a tug was incompetent and unfit or not equal in disposition to the ordinary man of his calling that he failed to act with heroism or with complete efficiency in the kind of emergency which occurred on the tug Herron? " 'All the exigencies of the intended route' " and " 'any exigency that is likely to happen' " do not quite cover what Captain Taylor had to meet. Certainly he was frightened and confused. So was everybody on the tug and so, I venture to say, would have been anyone, except a man of courage and resourcefulness far above and beyond that of an officer "equal in disposition and seamanship to the ordinary men in the calling", which is all that the law requires. Certainly Captain Taylor did not adhere strictly to the traditions of the sea when he was the second man to jump overboard. However, it is much easier to apply the logic of calm afterthought than to place one's self in the

position of men suddenly confronted with the prospect of imminent death in a flaming tugboat.

In the light of all these considerations, I cannot find that Captain Taylor's conduct in the few minutes involved in the disaster can form any basis for the conclusion that he was less competent than the ordinary man in the calling of a tugboat captain.

From what has been said, it follows that the petitioner is entitled to exoneration.

Decree accordingly.