Joseph S. PROVENZA, Plaintiff, Appellant,

v.

AMERICAN EXPORT LINES, INC., Defendant and Third-Party Plaintiff, Appellee.

AMERICAN EXPORT LINES, INC., Defendant and Third-Party Plaintiff, Appellant,

v.

ATLANTIC AND GULF STEVEDORES, INC., Third-Party Defendant, Appellee.

No. 8959.

United States Court of Appeals Fourth Circuit.

Argued June 6, 1963.

Decided Nov. 4, 1963.

John J. O'Connor, Jr., Baltimore, Md. (O'Connor & Preston, Baltimore, Md., on brief), for Joseph S. Provenza.

Southgate L. Morison, Baltimore, Md. (Ober, Williams, Grimes & Stinson, Baltimore, Md., on brief), for American Export Lines, Inc.

Herbert F. Murray, Baltimore, Md. (Clater W. Smith, Robert E. Powell, and Smith, Somerville & Case, Baltimore, Md., on brief), for Atlantic and Gulf Stevedores, Inc.

Before SOBELOFF, Chief Judge, and BRYAN and J. SPENCER BELL, Circuit Judges.

J. SPENCER BELL, Circuit Judge.

The plaintiff, a longshoreman, brought this action against the shipowner, American Export Lines, Inc., for injuries which occurred during loading operations, alleging unseaworthiness, negligence, and violation of safety regulations promulgated by the Secretary of Labor

under the Harbor Workers' Compensation Act as amended. (33 U.S.C. § 941). The shipowner in turn filed a third party complaint against the stevedore employer of the plaintiff.

Plaintiff was working as a "relief deck man" when a draft of cargo being loaded into the No. 2 hatch of the SS EXAMINER swung back in a pendulum-like motion, striking some metal hatch beams which fell or tipped over on the plaintiff's legs and broke them. The beams had been removed from the square of the hatch and stored on the inshore side of the ship between the hatch coaming and the waistplate. The testimony was conflicting as to whether or not and, if they were, how securely the beams were lashed. The plaintiff was standing between the beams and the ship rail near the after end of the hatch, from which point he was signaling to the winch drivers and giving orders to the men on the pier. Two winches located at the forward end of the hatch were being used to work the cargo in cooperation. The "inshore" winch picked up the draft and raised it above the level of the ship's rail and the hatch coaming; the "up and down" winch then pulled the load over the hatch opening preparatory to lowering it into the hold. As the cables of both winches were attached to the same load, they were in effect pulling against each other as the load was pulled from the pier to the hatch, thus it was necessary for the inshore winch to pay out its cable as the "up and down" winch retracted its line. During this operation, the up and down winch cut out while the inshore winch continued momentarily to pay out its line. This relieved the tension on the "joint" line, causing the load to swing down, striking the hatch beams, one or more of which struck the plaintiff. There was a conflict of evidence as to whether the "up and down" winch had previously cut out on several occasions that morning. There was also conflicting evidence as to whether the winch was in proper operating condition. The plaintiff contended both that the winch was in an unseaworthy condition and

that both the manner and place of storing the hatch beams constituted the ship unseaworthy with respect thereto. The usual interrogatories on seaworthiness, negligence, and contributory negligence were submitted. The court charged the jury that if they found the ship to be seaworthy in all respects they need not reach the other interrogatories. The jury answered the first interrogatory as follows:

"1. Was the SS EXAMINER unseaworthy with respect to

"(a) the starboard winch of the Number 2 hatch?

"Answer ('yes' or 'no') NO

"(b) the place and/or the manner of stowing the hatch beams on the deck of the vessel?

"Answer ('Yes' or 'no') NO."

■ The plaintiff appeals, alleging numerous errors in the trial of the case. Upon a reading of the charge as a whole we must reject the plaintiff's contention, which is the basis for many of his specific objections, that the charge devitalizes the doctrine of unseaworthiness. The charge is relatively long, and the court conscientiously undertook meticulously to present the contentions of each of the parties on the many points of law involved. It appears to us that the jury could not have failed to understand the court's statement that:

"Liability for an unseaworthy condition does not in any way depend upon negligence or fault or blame, that is to say, the shipowner is liable for all the injuries and consequent damage proximately caused by an unseaworthy condition existing at any time even though the owner may have exercised due care under the circumstances and may have had no notice or knowledge of the unseaworthy condition which proximately caused the damage."

■ The substance of this statement was repeated several times. We agree with the trial court that while the duty to furnish a seaworthy vessel is

an absolute, inalienable, non-delegable and continuing duty of the shipowner it does not make him an insurer of the safety of his crew. A seaworthy ship is one which is reasonably fit for its intended use. Gutierrez v. Waterman Steamship Corp., 373 U.S. 206, 213, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963); Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 550, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960); Grzybowski v. Arrow Barge Co., 283 F.2d 481, 484 (4 Cir. 1960); Ross v. Steamship Zeeland, 240 F.2d 820 (4 Cir. 1957). We find no such repetitive emphasis on the limitations to the standard of seaworthiness laid down by the Supreme Court as to create an imbalance in the charge. Ballwanz v. Isthmian Lines, Inc., 319 F.2d 457 (4 Cir. 1963).

The court's charge concerning the possible interplay between the negligence of the stevedore, if any, and the unseaworthiness of the equipment gave ample opportunity to the plaintiff to present all of his theories involving several combinations of the above factors.

We also agree with the court's conclusion that in the factual context of the case a finding that the vessel was seaworthy obviated the possibility of negligence proximately causing the plaintiff's injury. "Since unseaworthiness affords longshoremen recovery without fault and has been broadly construed by the courts, e. g., Mahnich v. So. S.S. Co. [321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561], * * * it will be rare that the circumstances of an injury will constitute negligence but not unseaworthiness." Pope & Talbot, Inc., v. Hawn, 346 U.S. 406, 418, 74 S.Ct. 202, 209, 98 L.Ed. 143 (1953) (concurring opinion of Justice Frankfurter).

We next come to the plaintiff's contention that the court erred in refusing to submit to the jury his claim of negligence and unseaworthiness predicated upon violation of the "Safety and Health Regulations for Longshoring" (29 C.F.R. § 9.1, et seq.) promulgated by the Secretary of Labor under the authority of Public Law 85–742, 72 Stat. 835, 33 U.S.C.A. § 941 et seq. The 1958 amendment to the Longshoremen's and Harbor Workers' Compensation Act was Congress' effort "to provide for establishing and enforcing an effective safety program in * * [the] hazardous occupation [of Longshoring] * * *." 1

Plaintiff contends that the violation of these regulations 2, no matter by whom

---

1. The House Report accompanying the 1958 Amendment to the Longshoremen's and Harbor Workers' Compensation Act points out that stevedoring is the most hazardous of all industries which report their experience to the Bureau of Labor Statistics, having an injury frequency rate of seven times that of manufacturing. (1958 U.S.Code and Cong.News, p. 3843. Section 41 of the Act (33 U.S. C.A. § 941(a)) reads:

"Every employer shall furnish and maintain employment and places of employment which shall be reasonably safe for his employees in all employments covered by this chapter and shall install, furnish, maintain, and use such devices and safeguards with particular reference to equipment used by and working conditions established by such employers as the Secretary may determine by regulation or order to be reasonably necessary to protect the life, health, and safety of such employees, and to render safe such employment

and places of employment, and to prevent injury to his employees."

2. The regulations pertinent to this case provide:
"§ 9.1 Purpose and Authority.
(a) The Longshoremen's and Harbor Workers' Compensation Act (44 Stat. 1424; 33 U.S.C. 901, et seq.) provides compensation for injuries suffered by employees when they are working for private employers within the federal maritime jurisdiction on the navigable waters of the United States, including dry docks. * * * [The law] requires, among other things, that every employer of the aforementioned employees 'shall install, furnish, maintain, and use such devices and safeguards with particular reference to equipment used by and working conditions established by such employers as the Secretary may determine by regulation or order to be reasonably necessary to protect the life, health, and safety of such employees, and to render safe such

violated, ipso facto makes the shipowner liable either on the theory of negligence or unseaworthiness. He relies upon Kernan v. American Dredging Co., 355 U.S. 426, 78 S.Ct. 394, 2 L.Ed.2d 382 (1958). That action was an exoneration and limitation proceeding involving the death of a seaman who had lost his life in a fire on his employer's tug, which at the time was towing a scow on the Schuylkill River in Philadelphia. The accident occurred at night, and under the Coast Guard regulations applicable the scow was to carry a white navigation light not less than eight feet above the surface of the water. The purpose of this regulation was to prevent collisions. The regulation was not complied with by the shipowner, who, instead of carrying a light no less than eight feet above the surface carried an open flame lantern on the barge three feet above the water. Fumes arising from waste petroleum products floating on the surface of the water ignited and the scow and tug were enveloped in flames, which caused the decedent's death. The trial court found that there was no negligence in carrying an open flame lantern on the barge three feet above the water, that since the danger encountered was not of the sort that the Coast Guard navigation regulation was designed to guard against, and since there was no negligence in having a light three feet above the surface, there could be no recovery under the Jones Act [3]. The Court of Appeals affirmed [4]. The Supreme Court reversed holding that recovery could be had under the Jones Act for the death which resulted from the violation of the statutory duty concerning lights even though there was no negligence in having the lantern three feet above the water and even though the character of the risk involved was not that which the statute was designed to guard against. In reaching this conclusion, the court relied on decisions under the Federal Employer's Liability Act, in which the court had held that recovery could be had for injuries resulting from the violation of the Safety Appliance Acts or the Boiler Inspection Act without regard to whether the injuries which flowed from the breach were the type the statute sought to prevent. Those principles developed under FELA were to be incorporated in construing the Jones Act, which grants to seamen the rights given to railroad employees under FELA.

employment and *places of employment*, and to prevent injury to his employees'. It is the purpose of the regulations of this part to carry out the intent of Public Law 85–742. [Emphasis added].

"§ 9.2 Scope and Responsibility.

(a) The responsibility for compliance with the regulations of this part is placed upon 'employers' as defined in § 9.3(c) of this part.

(b) It is not the intent of the regulations of this part to place additional responsibilities or duties on owners, operators, agents or masters of vessels unless such persons are acting as employers, nor is it the intent of these regulations to relieve such owners, operators, agents or masters of vessels from responsibilities or duties now placed upon them by law, regulation or custom.

"§ 9.3 Definitions.

(a) The term 'shall' indicates provisions which are mandatory.

(b) The term 'Secretary' means the Secretary of Labor.

(c) The term 'employer' means an employer any of whose employees are employed, in whole or in part, in longshoring operations. * * *

"§ 9.43 Handling Beams and Covers.

(b) Beams shall be laid on their sides, or stood on edge close together and lashed. * * *

(c) Strongbacks, hatch covers and pontoons shall be so placed as not to interfere with a safe walkway from rail to hatch coaming or fore and aft, and so secured that they cannot be tipped over or dragged into hatches or overboard by drafts or gear. Dunnage or other suitable material shall be used under and between tiers of strongbacks and pontoons.

"§ 9.91 Housekeeping.

(d) Loose paper, dunnage and debris shall be collected as the work progresses and be kept clear of the immediate work area."

3. Matter of American Dredging Co., 141 F. Supp. 582 (E.D.Pa.1956).

4. Matter of American Dredging Co., 235 F.2d 618 (3 Cir. 1956).

Kernan can be distinguished, as suggested by the defendants, because the regulation in that case applied to the shipowner, whereas here the regulations by their express terms apply only to the stevedore. Nevertheless, if the violation of the regulations by the stevedore created a dangerous condition then the law is clear that the shipowner is in turn also liable, even if he did not know of the dangerous situation created by the stevedore, for that is the nature of the owner's duty of seaworthiness. Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953).

In Kernan the minority criticized the decision on the grounds that they saw no justification for applying the principles developed under FELA (absolute liability for violation of an "off target" regulation) to the violation of a Coast Guard regulation having no relationship to the cause of decedent's death. Such an argument may not be advanced here, since the regulation alleged to be violated related directly to the cause of plaintiff's injury.

We are unable to escape the conviction that it was error for the court not to read the regulations as requested and charge the jury that they were binding in law.

While the definition of seaworthiness laid down by the court [5] was correct as a general statement of law, we think the plaintiff was entitled to have put before the jury the definite standards set up in the regulations promulgated by the Secretary of Labor defining reasonably safe conditions in the exact area involved in this case. Furthermore, we are also forced to the conclusion that in the area covered by the regulations their

violation would render the ship unseaworthy, and if such unseaworthiness was the proximate cause of the plaintiff's injury, it would also render the defendant shipowner liable. It follows, of course, that if the jury should find that the stevedore had violated the regulations such conduct could also constitute negligence. If in turn this negligent conduct of the stevedore were known, or by the exercise of reasonable care should have been known to the shipowner, and such negligence of the shipowner was a proximate cause of the plaintiff's injury, then he too would be liable to the plaintiff on the additional grounds of negligence.

Prior to the enactment of 33 U.S.C.A. § 941 and the promulgations of the regulations thereunder what constituted negligence or unseaworthiness was to be determined by the jury under the definitions laid down by the courts. Now, with respect to longshoring, the statute law of the United States has laid down definite standards, and we think the plaintiff longshoreman is entitled to have those standards applied to both the defendants in this case.

The defendant insists that the regulation is entitled to no evidential value and that the judge was correct in declining to call attention to it in his charge to the jury. The basis for this is that the regulation declares that it is not intended to place additional responsibilities or duties on shipowners or to relieve them of responsibilities or duties. The argument has only a superficial plausibility and does not withstand analysis.

The regulation casts upon the shipowner no new duty nor does it relieve him of any pre-existing duty. Now, as before the regulation was promulgated, it is

---

5. In defining unseaworthiness the court below said:

"The crucial consideration is whether the ship was in all respects pertaining to the injury reasonably fit to permit Provenza to perform his tasks aboard the ship with reasonable safety. What all this means is that the defendant, American Export Lines, owed to the plaintiff, Provenza, the duty to have the ship reasonably fit to permit him to do his work on board in the manner in which he intended to work, that is, with reasonable safety. This is true although Provenza was not employed by American Export and although other stevedores and not ship's personnel may have moved the beams and although other stevedores operated the gear, the winches furnished by the shipowner."

incumbent on him to supply a seaworthy ship. Now, as before, if the ship becomes unseaworthy through the act of the stevedore or anyone else, and this condition is the proximate cause of an injury, the shipowner is liable. The legal duty is the same. All that the regulation does is to define how this well-established duty shall be discharged in particular circumstances by the stevedore who has undertaken to perform the shipowner's nondelegable duty: "beams shall be laid on their sides, or stood on edge close together and lashed". § 9.43(b). It prescribes a standard of safety, not a new duty. Nothing in the regulation forbids its being mentioned to the jury.

Of what possible use would a safety regulation be if its sanction is withdrawn by suppressing knowledge of it from the triers of fact? How can it be determined whether a condition complained of meets the standard of safety if the jury is kept in the dark as to what that standard is? To convert the provision which disavows an intent to add to or diminish the owner's duty into a direction to keep the safety provision secret is to make the entire regulation ineffective and meaningless. We cannot attribute to the draftsman any such fatuous and self-defeating design. The defendant's brief concedes that the purpose of the regulations was to make working conditions for longshoremen safer and thereby prevent accidents. We fail to see how it can possibly further this purpose to impose a rule of silence in respect to the regulations. We think the defendant's interpretation misreads the provision in question.

A more reasonable reading and one that observes both the language and the spirit is that *no new duty* is to be exacted where none existed before and, equally, *no existing duty* is to be excused by reason of the regulation; but the regulation's requirement may be considered by the trier of fact in determining whether its nonperformance has resulted in a failure to meet a duty incumbent upon the defendant—specifically in this instance whether an unseaworthy condition was created by leaving "I beams" loose on the deck where longshoremen were working. We so hold, for only such a reading avoids the incongruity contended for by the defendant and gives a rational effect to every part of the regulation.

■■■■■ This still leaves ample scope to the language of section 9.2(b) under consideration. It is to be noted that the statute provides a criminal penalty of $100 to $3000 for each conviction of a willful violation of the safety regulations prescribed pursuant thereto. As we read the statute, it means that the owner (operator, agent or master) is not amenable to such criminal penalties for the stevedore's violations; but the owner's duty to provide a seaworthy ship remains unchanged. If the stevedore makes the ship unseaworthy by violating a prescribed safety regulation, the statute says nothing either to absolve the owner from liability or to foreclose reference to the regulation in an effort to show that the condition which the stevedore caused or permitted fell short of recognized safety standards. The owner's duty does not stem from the regulation, but the regulation may be shown just like other evidence to indicate that a certain practice is safe or unsafe. While such evidence is not conclusive, it is relevant. It would be equally available to a shipowner to defend against a claim of unseaworthiness by showing that, although a longshoreman had sustained injury, the stevedore's performance was not substandard and in fact complied with the prescribed regulations.

The judgment in favor of the shipowner is reversed, the third party claim against the stevedore is reinstated, and the case remanded for retrial.

Reversed and remanded.

ALBERT V. BRYAN, Circuit Judge (dissenting).

No error, it seems to me, can be found in the refusal of the trial court to submit to the jury the "Safety and Health Regulations for Longshoring". In explicit language the regulations themselves exclude

this use of them. There is no ambiguity or contradiction in the exclusion, which is contained in § 9.2(b) in these words:

"(b) It is not the intent of the regulations of this part to place additional responsibilities or duties on owners, operators, agents or masters of vessels unless such persons are acting as employers, nor is it the intent of these regulations to relieve such owners, operators, agents or masters of vessels from responsibilities or duties now placed upon them by law, regulation or custom."

Its object is altogether plain: that the regulations should not be taken as adding to, subtracting from, or in any other way affecting the responsibilities of a ship, her owners or operators to one not in their employ. Intrusion into that area was studiedly avoided.

Yet, over the protest of the regulations themselves, the Court now applies them to place a duty on the defendant shipowner to a non-employee. Ordinarily, a breach of a regulation, it is true, may be evidence of a breach of the civil duty therein imposed, but certainly such proof cannot be adduced for this purpose when, as here, the regulations by their very terms affirmatively forbid the accordance of any such effect to them.

Argument that the regulations merely evidence standards of care and do not create a duty is an over-nice distinction. The regulations were intended to, and do, declare duties of an employer to a longshoreman. Their character does not change when they are transplanted to the relationship of shipowner to non-employee. Even if there is no transfer of duty in this sense, there is obviously the creation of a duty upon the shipowner by the regulations, in that they establish a measure for determining whether the shipowner has met his general maritime and common law obligations. To fix criteria is to fix a duty.

The charge of the District Judge was, admittedly, fair and full. It embraced rules of care for the longshoreman equivalent to those demanded by the regula-

tions. It laid upon the shipowner responsibility for any neglect by the stevedore of these safeguards. The trial judge would certainly have been at fault if he had instructed, as the majority now hold he must, that obedience of these rules should be measured by reference to safety measures promulgated by the Secretary of Labor but from which he deliberately excepted shipowners.

The exclusion cannot be erased by deriding it as "a rule of silence". Nor are we free to adopt certain parts of the regulations and ignore others. I would affirm the judgment on review.