Foster, Appellant, *v.* Sol Greisler & Sons, Inc.

Argued October 5, 1942.

Before Keller, P. J., Cunningham, Baldrige, Rhodes, Hirt and Kenworthey, JJ.

510

*Abraham E. Freedman,* of *Freedman & Goldstein,* with him *Howard M. Long,* for appellant.

*Ward C. Henry,* of *Swartz, Campbell & Henry,* with him *Herbert A. Barton,* for appellee.

OPINION BY KELLER, P. J., November 18, 1942:

This is a negligence case. Plaintiff appeals from an order of the court dismissing his motion to remove a nonsuit. A nonsuit was entered on the grounds that (1) plaintiff failed to offer any evidence of negligence and (2) plaintiff was guilty of contributory negligence as a matter of law. Defendant, properly we think, concedes there was evidence from which the jury would have been warranted in concluding defendant was negligent.

We are all of opinion the question of the plaintiff's contributory negligence was for the jury.

Defendant is engaged in the business of selling meat at wholesale. Its place of business is located on the west side of Delaware Avenue between Market and Arch Streets in Philadelphia. Plaintiff, for eight years prior to the accident, had been employed by the American Stores as chauffeur to Jesse M. Dietz, the head of its meat department.

About 6:35 on the morning of April 4, 1938, plaintiff, with Dietz, was making the rounds of the meat markets along Delaware Avenue. While walking on the sidewalk in front of defendant's store, he was struck and injured by a quarter of beef which was being unloaded from a freight car in the middle of Delaware Avenue into defendant's store. The meat was travelling on an overhead rail extending from the car to the store. The speed the meat was travelling was not specifically

given, but there was testimony it sometimes moves at the rate of 30 miles per hour depending upon its weight. The piece which struck plaintiff was 2½ feet wide, 3 to 4 feet long and weighed about 200 pounds.

The device which defendant used for unloading meat was in common use in the neighborhood and plaintiff was entirely familiar with it.

As plaintiff approached the place where he was struck he noticed the freight car, that the door was open and that the rail was in position for unloading. But he said it had been the invariable custom for years that whenever unloading was actually taking place, a man in a white coat would be stationed on the sidewalk "watching the pedestrians so they don't get hit."[1] On the morning of the accident other meat dealers who were unloading had a man properly stationed on the sidewalk.

Because of the absence of a man on the sidewalk in front of defendant's place, plaintiff assumed defendant was not unloading. Although he was not specifically asked whether he looked toward the car immediately before he passed under the rail, plaintiff did say he did not see the piece of meat until after it struck him. The inference is he did not look, but relied on the assumption defendant was not unloading.

But whether he should have looked and whether his reliance on the absence of a man on the sidewalk to warn pedestrians was reasonable under the circumstances were for the jury, not for the court. In a negligence case the function of the jury is not merely to determine the basic facts upon conflicting evidence; it is the jury's function to determine the appropriate rule of conduct for the particular circumstances found to have existed. And the power of the court is to set aside this finding only "when it is inconceivable, on

---

[1] These are the words of Dietz, but plaintiff was equally familiar with the custom.

any reasonable hypothesis, that a mind desiring solely to reach a just and proper conclusion in accordance with the relevant governing principles of law ...... could determine in [plaintiff's] favor the controlling issues involved: *Virgilio v. Walker,* 254 Pa. 241." *Jester v. Philadelphia, Baltimore & Washington Railroad Co.,* 267 Pa. 10, 109 A. 774. Whether plaintiff exercised reasonable care under the circumstances is a question about which reasonable minds might differ. And even if all the members of this court would, as jurors, have found plaintiff guilty of contributory negligence, it would be a usurpation of the function of that body to so hold. We are not an appellate jury.

.Decisions relied on by defendant in which recovery was denied because plaintiff tested an obvious danger are not in point.[2] Here plaintiff said the danger was not obvious and gave his reason why it was not. The case is similar in its facts to *Ryan v. Ardis,* 190 Pa. 66, 42 A. 372. And it is similar in principle to *Murphy v. Bernheim & Sons, Inc.,* 327 Pa. 285 194 A. 194, and *Graff v. Scott Bros., Inc.,* 315 Pa. 262, 172 A. 659.

Since the case must be retried, it may be well to make a further observation. In our opinion plaintiff was not given a fair trial because he was not given an opportunity to develop the facts of his case properly. A number of objections were made by counsel for defendant without any statement of the ground for the objection[3] and most of them were sustained without any

---

[2] *Bilger v. Great Atlantic & Pacific Tea Co.,* 316 Pa. 540, 175 A. 496; *Ziegler v. Western Union Telegraph Co.,* 319 Pa. 274, 179 A. 45; *Walberg v. Rocolene Refining Co.,* 340 Pa. 200, 16 A. (2d) 390; *Burckhalter v. F. W. Woolworth Co.,* 340 Pa. 300, 16 A. (2d) 716; *Rogers v. Max Azen, Inc.,* 340 Pa. 328, 16 A. (2d) 529.

[3] As early as 1852 our Supreme Court remarked that general objections are to be discouraged and are looked upon "with some marks of dislike." *Blackstock v. Leidy,* 19 Pa. 335, 339. And see Moschzisker, Trial By Jury (2d ed.) Sec. 204-206.

indication of the reason for the ruling. As a result, plaintiff's counsel was left completely in the dark as to what was wrong with his questions and was, therefore, considerably handicapped in the presentation of his client's case. For example, although plaintiff had testified that he had been engaged as chauffeur for Dietz for 8 years during which his duties had required him to visit the various meat markets along Delaware Avenue, from which it might be inferred he was familiar with the customary method of unloading meat (in fact this inference was one of the grounds on which the nonsuit was granted), he was asked: "By Mr. Freedman: Q. Is there a guard posted there, generally speaking—Mr. Henry: That is objected to. The Court: Objection sustained. Mr. Freedman: If your Honor please, I think the evidence of custom in this respect may be relevant to show what may be expected by the pedestrians in that vicinity. The Court: There is no objection to that statement at all, counsel. By Mr. Freedman: Q. Well, Mr. Foster, are there any precautions taken generally in connection with the movement of meat from the freight car to the premises? Mr. Henry: I will object to that. The Court: Objection sustained."

Following this, counsel for plaintiff again developed the fact that plaintiff was familiar with the custom. He then asked the following: "Q. What is the custom with respect to that practice? Mr. Henry: Well, now, wait a minute. I have to object to that general question. The Court: Objection sustained. By Mr. Freedman: Q. Will you tell us what you notice whenever this process takes place, whenever the meat is being transported from the sidewalk that way? Mr. Henry: I object to the form of the question. Mr. Freedman: I tried not to lead him, sir. The Court: Objection sustained. By Mr. Freedman: Q. Will you tell us what you observed, who was present and how that is ac-

complished, how many men are required to do it generally, from your experience in going down in that vicinity? Mr. Henry: I will have to object to that. I have no objection at all to a description of what was going on at the particular time when he came up there and when he alleges he was struck, but the general proposition I object to. Mr. Freedman: I think it is relevant to show what the general practice is, in order to determine what the pedestrian had a right to expect. The Court: Objection sustained. Mr. Freedman: Will Your Honor grant me an exception? The Court: Oh, certainly. Any time you want an exception, counsel, just ask for it. By Mr. Freedman: Q. Was there any one on the side walk at the time you started to proceed over the sidewalk at 32 North Delaware Avenue on this occasion? A. No, there was nobody there. Q. There was no one there from the Greisler Corporation? Mr. Henry: I object to that. That is leading and suggestive. The Court: Objection sustained. By Mr. Freedman: Q. Now, you tell us what happened in your own words, Mr. Foster. A. When I come up, they were unloading meat, and it usually takes about three men at the—The Court: You told me before, Mr. Foster, that there was a man in a white coat on the sidewalk, as I understood you. Mr. Freedman: He said generally, sir. I was asking him generally. Mr. Henry: As far as general conditions are concerned, I move to strike it out. By Mr. Freedman: Q. In order to clarify the point, was there a man—The Court: No, not 'in order to clarify the point.' By Mr. Freedman: Q. Well, was there anybody with a white coat on the sidewalk at that time? Mr. Henry: That is objected to as irrelevant and leading. The Court: Objection sustained."

Again: "Q. Before you get to that, were you given any notice of the fact that this fore quarter of beef was coming over the sidewalk? Mr. Henry: Objected to. The Court: Objection sustained. By Mr. Freed-

man: Q. Proceed and tell us what happened after that. Mr. Freedman: Your Honor will grant me an exception sir? The Court: Oh, very gladly, counsel."

Again: "By Mr. Freedman: Q. Was there any one on the sidewalk at the time you were struck? Mr. Henry: That is objected to. The Court: Objection sustained."

When plaintiff came to attempt to develop the nature and extent of his injuries, he encountered similar difficulties.

Apparently most of the objections were sustained on the ground that the questions were leading. This must be so because clearly plaintiff was qualified to state his observations as to whether there was a man on the sidewalk wearing a white coat and as to what was the general practice with regard to guarding pedestrians against injury. The trial judge expressly said these issues were relevant and subject to proof. And the same evidence was subsequently admitted when Dietz, who was not shown to have had any wider knowledge of the subject than plaintiff, was permitted to testify on them.

In the modern view, most of the questions were not leading and the court erred in excluding them. To quote from the opinion of the Supreme Court in *Waltosh v. Penna. R. R. Co.*, 259 Pa. 372, 377, 103 A. 55: "In the seventh assignment of error it is alleged that the court below erred in sustaining an objection to a question put to plaintiff by his counsel. He had testified that, when he came to the main tracks, he looked both up and down the track to see whether he could cross. Then his counsel asked: 'Did you hear any train coming down?' He answered, 'No.' Counsel then asked: 'Did you listen for a train coming down?' This question was objected to as leading and was excluded. A leading question is one which suggests to the witness the answer desired. There is nothing in the form of this

question to indicate the desire of the examiner. That it is categorical, and may be answered either 'Yes' or 'No,' does not necessarily make it leading. In 40 Cyc. L. & Pr. 2423, it is said: 'The Common-law rule is that a question is leading where it embodies a material fact and admits of an answer by a simple affirmative or negative; but in modern times this rule has been somewhat departed from by a number of decisions which hold that such a categorical question is not necessarily leading, provided of course that it is not so framed as to give an indication as to which answer is desired.'

"Complaint is also made of the exclusion of a question put to plaintiff's witness McHally, as follows: 'Were you in a position where you could have heard the whistle of that train if it had blown?' This question does not indicate the answer desired, and, therefore, was not leading. The inquiry was proper and should have been permitted."

In the light of these established principles, the trial of this case should have been conducted in a much more liberal manner. The manner in which it was conducted would have had the effect of depriving the plaintiff of a fair submission to the jury of the questions of fact involved even though the excluded evidence was subsequently supplied by another witness.

The order refusing plaintiff's motion to remove the nonsuit is reversed and a new trial granted.