**Herbert WIGGINS, Administrator of the Estate of James Wiggins, Appellant,**

v.

**CITY OF PHILADELPHIA**

v.

**PHILADELPHIA TRANSPORTATION COMPANY.**

No. 14495.

United States Court of Appeals Third Circuit.

Argued Dec. 10, 1963.

Decided April 29, 1964.

---

Louis S. Fine, Philadelphia, Pa. (Arnold C. Grossman, Fine, Staud & Silverman, Philadelphia, Pa., on the brief), for appellant.

Matthew W. Bullock, Jr., Deputy City Sol., Philadelphia, Pa., for City of Philadelphia. Martin Greitzer, Philadelphia, Pa., for Philadelphia Transportation Co.

(Harry A. Takif, Takif & Bolger, Philadelphia, Pa., on the brief), for third party defendant, Philadelphia Transportation Co. (James L. Stern, Second Deputy City Sol., Edward G. Bauer, Jr., City Sol., Philadelphia, Pa., on the brief), for the City of Philadelphia, appellee.

Before BIGGS, Chief Judge, and McLAUGHLIN and HASTIE, Circuit Judges.

BIGGS, Chief Judge.

 The appellant, administrator of the estate of James Wiggins, filed an action against the City of Philadelphia under the Pennsylvania Wrongful Death Act, 12 P.S. §§ 1601 et seq., and the Pennsylvania Survival Act, 20 P.S. § 320.601, based upon fatal injuries suffered by the plaintiff's decedent as the result of an electric flash or explosion which occurred on October 11, 1958 while he was on duty as a conductor employed by Philadelphia Transportation Company (P.T.C.) on an elevated car, Car No. 553, of the Market-Frankford elevated line, owned by the City of Philadelphia. The City joined P.T.C. as a third-party defendant to the suit pursuant to Rule 14(a), Fed.R.Civ. Proc. 28 U.S.C. The court below entered judgment in favor of both defendants and the plaintiff has appealed from a refusal to grant a new trial. Jurisdiction is based on diversity and the law of Pennsylvania governs. Since the court below entered a judgment in favor of the City, it was required to view the evidence, both in the record and proffered, in the light most favorable to Wiggins and to give Wiggins the benefit of all reasonable inferences. Pritchard v. Liggett & Myers Tobacco Co., 295 F.2d 292 (3 Cir.1961); Lescznski v. Pittsburgh Railways Co., 409 Pa. 102, 185 A.2d 538 (1962). So viewing the evidence, we state the following.

Car No. 553, moving slowly, was leaving the 34th Street Station in Philadelphia when a passenger, Mrs. Marie Day, told Conductor Wiggins that she smelled smoke and said the smoke seemed to come from the keyhole in the cab of the car. The passengers became excited and Wiggins came forward and opened the door of the cab and reached in with the key in his right hand. His left hand was at his side. There was first a small popping sound followed by an explosion and an electrical flash. Wiggins' clothing was set on fire and he died of second and third degree burns. He made a statement to an intern shortly before he died that when he opened the door to the control panel, there was a flash and that he did not know what occurred thereafter.'

The cab to which we have referred was a closet-like compartment about the size of a telephone booth, made of metal, with a metal door, situated at one end of the car. Inside the compartment was a metal box which contained the electrical control panel which energized the car. This box also had a metal door. One metal key in the possession of the conductor, Wiggins, could open both doors. Among the car's electrical controls was the main power switch, a slender piece of metal about 10 inches long with a wooden handle. The lower end of this piece of metal or switch was connected to the wall of the control panel by a swivel base. The swivel base permitted it to move in an 180 degree arc. When the switch was raised to the top of the arc it fitted into two clips or jaws and when so fitted the switch closed the circuit providing the car (and the train) with electric power. A switch of this kind is known as a "knife switch". The door of the panel enclosing the switch, when closed, left a clearance of only an inch or an inch and a half between the switch and the metal door of the electrical control panel whether or not the metal was engaged or disengaged. The result of this arrangement was that even if the metal should slip or the clips themselves become loose the switch could not fall out but would lean against the door. If the switch became disengaged while the car was under power, a powerful and dangerous electric arc [1] could be caused. For this reason P.T.C. had in-

---

1. An electrical arc was described by F. C. Jaunich, an inspector employed by the City of Philadelphia to inspect such cars as Car No. 553, as follows: "An arc is

structed its conductors never to disengage the switch while the train was in motion.

The evidence shows that the City owned one hundred subway elevated cars of the same kind as Car No. 553. In 1922 the City had prepared the specifications for the construction of these cars, including the installation of the knife switch to which we have referred. There had been only one flash or explosion occurring within the electrical control box in the thirty-six years that these cars had been operated. This occurred to a different car than Car No. 553, but to one of the same hundred cars. This earlier flash or explosion was caused by a short circuit in a wire leading to the main switch.

Pursuant to a lease dated May 5, 1922, and renewed July 1, 1957, entered into by P.T.C. with the City, P.T.C. had the responsibility to inspect, repair and maintain Car No. 553 in such a way as would provide "safe and reasonably adequate accommodations" for transporting the public.[2] In fulfilling the terms of the lease, P.T.C. conducted electrical inspections, designated as "B" and "C" inspections.[3] The "B" inspections were undertaken every three months and included cleaning and resetting the clips in order to ascertain if they were loose. The City also made spot inspections of the cars from time to time, including Car No. 553, in order, it is asserted to protect its financial interest and to make sure that the terms of the lease were being complied with by P.T.C. The last inspection by the City of Car No. 553 as shown by the record was made in 1956 about two years before the accident.

The contentions of the plaintiff as to how Wiggins received his burns are not entirely clear. The plaintiff seems to assert, however, that the main switch, the power switch, fell loose because of the vibration of the train and fell against the door of the electrical control compartment. It would seem to follow, though the plaintiff does not expressly contend this, that when Wiggins reached into the cab with the metal key in his right hand, the heavy current arced through the door

---

the induced current that follows the switch. When the switch is pulled, if the switch isn't pulled fast, there is an arc if it is pulled fast, but it will continue if it is stopped, and if it stops within an inch or two inches of the thing, that arcing will just build up and burn the metal away." The sentence is somewhat garbled but its meaning is clear enough.

Transit Engineer Tennyson, employed by the City, gave a more graphic description. He described an arc as: "A stroke of lightning between two noncontacting surfaces."

2. The fourth paragraph of the lease provides in pertinent part as follows: "Fourth. The Company shall and will at all times during the continuance of this lease, operate the railway and other property hereby demised so that in connection with its own system of railways it will furnish safe and reasonably adequate accommodations to the public. It shall keep the buildings, equipment and personal property demised hereunder insured to at least such proportionate extent as it shall keep insured its own like property and in the event of loss or damage by fire it shall apply the insurance to the replacement or restoration of the property destroyed or injured, and to such extent as the same is not insured shall replace or repair the same out of the current operating revenues of the combined properties. Furthermore, it will maintain and renew, out of earnings received from the transportation of passengers on the system of street railways of which the demised premises are a part, whatever may be lost or worn out, and items so replaced shall become the property of the City, subject, however, to the Company's right hereunder as lessee. . . ."

3. "B" inspections are electrical inspections conducted by P.T.C. every three months, whereby the elevated cars in their entirety are checked for worn or frayed wiring, loose wiring, lighting, etc. These inspections included inspection of the main switch which was examined, cleaned and reset if the clips or "jaws" were found to be loose.

"C" inspections occurred when the cars had run from six to eight thousand miles and consisted of a general overhaul including electrical equipment.

There is no doubt from the record that Car No. 553 received both the "B" and "C" inspections conducted by P.T.C. in due course.

from the switch into Wiggins' body setting his clothing on fire. We note that Dr. Harvey W. Weldin who examined Wiggins following the accident stated that Wiggins' hand was not burned and that his burns could not be "of an electrical source. * * * " The defendant's Exhibit "D–2" supports the plaintiff's view to some degree [4] though the defendant maintains that Wiggins must have used his key to open the door of the electrical-control cabinet. It points out that immediately after the accident the switch was only a few inches out of the switch jaws and had not fallen to the end of the full arc of 180 degrees. Mrs. Day testified that Wiggins did not open the door of the electrical control panel but Wiggins' statement made in the hospital may invalidate her testimony in this respect. In any event, one might suppose that if the switch blade had been held in place by the jaws, it would not have been resting against the door of the control panel. It may be noted, as appears from the contents of note 4, supra, that it was the position of Inspector Jaunich that the trouble was caused by an overheated emergency light relay coming through the control cabinet doors into the motorman's cab. Ordinarily, these are questions to be determined by the triers of facts. The case at bar, of course, was not sent to the jury.

The complaint alleges that the City "owned, operated, and controlled the trains of the Market-Frankford Elevated"; that Wiggins was employed as a conductor on the train on which he was injured. Paragraph 6 is as follows: "Due to the defective condition of * * * [the] elevated train there occurred an electrical flash which electrical flash resulted in extensive burns to the body of the decedent, James Wiggins." It appears, therefore, from his complaint that the plaintiff bottomed his case on the contentions that there was retention of control by the City of its elevated railroad and equipment and that the City maintained that equipment in a defective condition. Moreover, the plaintiff adhered to this position in his Pretrial Memorandum. The Pretrial Memorandum is required by the Standing Order of the trial court relating to pretrial conferences in other than protracted cases. The Standing Order was adopted October 23, 1958, and therefore was in effect when the pretrial conference in the instant case was held. The Standing Order also provides that where there is disagreement as to contentions of the respective parties that counsel "should briefly set forth his client's contentions or position on such matters." Under the circumstances the filing of a Pretrial Memorandum by the plaintiff was mandatory and it was an essential part of the pretrial conference technique.

In his Pretrial Memorandum the plaintiff stated in his statement of facts: "Due

---

4. Jaunich's report was as follows: "Description: Frankford Type Cars # 525, 502, (553), 600, 552. Car # 553 was the third car in the train and where the trouble occurred. # 1 Smoke from an overheated emergency light relay coming through control cabinet doors into motormans cab at "A" end of car. # 2 Conductor opened switch cabinet door and pulled the main switch which is knife switch while it was still carrying heavy electrical load and without his first turning the group switch out which would have broken the circuit first in the normally safe manner. The instant the heavily loaded circuit was broken by opening the knife type main switch a heavy arc was created between the switch blade and the switch jaw, burning the main switch blade and the switch jaw and burning the main switch blade in two at a point just below the wooden handle. The conductor was burned severely, four passengers were injured, threatening panicking and one was suffered burns [sic] while assisting the injured conductor. Inspector's Remarks: The above incident apparently was caused by possible lack of understanding the proper procedure by the conductor. Refresher courses taken by the train crews every few months after they qualify to operate the trains would do much to cut down injuries and also shorten breakdown delays. Date: Oct. 14, 1958 Inspector: Frank O. Jaunich, T.R.S.D.P.P. Note: Repairs and the replacement of the main switch and light relay has now been completed."

to a defect in the equipment, the plaintiff was injured, which injuries resulted in his death. The elevated cars were owned and controlled by the City of Philadelphia." He went on to say, however: "The City leased the equipment to the P.T.C. but the City had the right to replace dangerous or old equipment. The particular piece of equipment was purchased in 1922 and was in continuous operation to date." It will be noted that the plaintiff did not contend expressly that the accident to Wiggins occurred because of obsolete, old, or dangerous equipment on Car No. 553 but perhaps such an implication can be construed from the language which he employed. The plaintiff attempts to bolster his position by asserting that the lease gives the City the right to replace worn out equipment. In so contending the plaintiff relies on Paragraph "Eighth" of the lease which provides that P.T.C. "shall permit the Department of City Transit, under reasonable regulations, to have access at all reasonable times to the property leased hereunder, for the purpose of doing thereon any work the City is required to do under this agreement, and for periodical inspections and tests, provided, however, that the City shall save the Company harmless from loss or damage or liability for loss or damage by negligence of its servants or otherwise caused to or by the agents of the City while upon the property leased hereunder or while upon the property of the Company, or otherwise by reason of permitting such access."

■ The pretrial conference was conducted on September 20, 1962 by another Judge than the Judge who tried the case. At its conclusion the pretrial-conference Judge ordered that the stenographic notes of the pretrial conference be transcribed and filed and that the transcription should constitute the pretrial order in the case. Cf. Rule 16, Fed.R.Civ.Proc., 28 U.S.C. Relevant matters were discussed at the pretrial conference but there was no suggestion that the plaintiff would rely on any deficiency in design in the electrical equipment on Car No. 553. Nonetheless, in the court below he offered evidence that the design of the switch was defective because a plastic hook or some similar device would have kept the switch in place even if the blade had become dislodged from the jaws by the jolting or vibration of the car while it was in motion. The evidence offered as to a plastic hook goes to the point of deficiency in design of the electrical equipment within the control box, an issue not open to the plaintiff because of the limitations which he imposed upon himself by his failure to assert such a position at the pretrial conference. See the pretrial order. This is so even though it be conceded, as it must be, that in 1922 the City designed the switch and the car when it was placed in operation. This limitation is not a mere exercise in semantics. Neither in his pleading nor in his Pretrial Memorandum nor in the colloquy which comprised the pretrial order did the plaintiff employ the word "design" or any similar term. To have permitted him to have asserted a new position by claiming deficiency in design would impair the efficacy of the pretrial conference procedure and would have been manifestly unfair to the City. The trial judge ruled correctly in excluding evidence based on such a theory.[5] The issue is foreclosed to the plaintiff in this court also, although he has attempted to argue it here.

---

5. The pretrial conference dealt largely with the ownership and control of the cars, including Car No. 553, by the City and it was alleged in connection with this that "A City inspector checks the trains in question for defects and maintenance". While we have enlarged this view somewhat as will appear hereinafter in the opinion, we do so to the end that all favorable inferences may be made available to the plaintiff. It will be noted that at pretrial the plaintiff suggested no amendments to its complaint.

We suggest that the preferable practice in framing a pretrial order under circumstances such as those at bar would be to frame a separate pretrial order and not employ the transcribed notes of the pretrial conference hearing as the pretrial order. See the provisions of Rule 16, Fed.R.Civ.Proc., 28 U.S.C.

The issue of deficiency of the actual equipment, i. e. a breakdown in the equipment, still remains open and we are of the opinion there was sufficient evidence to go to the jury on this issue, provided, of course, that a duty to maintain the switch in proper condition can be brought home to the City. See the Jaunich report set out in note 4, supra. The determination of the duty of the City in respect to the maintenance of the switch turns upon the issue of control which depends on the terms of the lease and what the City and P.T.C. did in respect to the operation of the cars, including Car No. 553. Spinozzi, etc. v. E. J. Lavino and Company, 243 F.2d 80, 82–83 (3 Cir. 1957).

██ As we have said, P.T.C. made inspections, Type "B" and Type "C", of the cars.[6] The record also shows that Mr. Jaunich made spot checks of the cars used on the Market-Frankford elevated line, including Car No. 553, and from time to time reported deficiencies which he deemed required correction by P.T.C. It is also in the record that sometimes P.T.C. made the suggested repairs and sometimes it did not. It was repeatedly assert by witnesses for the City that these inspections were made in order to enable the City to protect its financial interests and to insure that the terms of the lease were being complied with by P.T.C. But one of the terms of the lease, as will appear upon an examination of the fourth paragraph of the lease, set out in note 2, supra, was that P.T.C., during the continuance of the lease, should operate and maintain the railway and the other property demised, including the cars, in such a way that it would furnish safe and reasonably adequate accommodations to the public. Can it be said that the City retained any substantial measure of control over its demised premises and equipment and assumed any responsibility to make certain that the service contracted for was performed with reasonable safety by P.T.C. as required of it by the lease? It was the duty of the trial judge to construe the terms of the lease. Jamison, Administrator of the Estate of Tucker v. A. M. Byers Company, 330 F.2d 657 (3 Cir. 1964); Easton v. Washington County Insurance Company, 391 Pa. 28, 137 A.2d 332 (1957). The trial judge construed the obligations of the lease to place "sole responsibility" for the safety of the operation of Car No. 553 in P.T.C. under the lease.[7] The trial judge apparently accepted the statements of the City's witnesses to the effect that the inspections conducted by Jaunich for the City were only to protect the City's financial interest in the property and for the purpose of making sure that P.T.C. was fulfilling its obligations under the lease. Though one of these was the safe carriage of the public, the lease does not obligate the City to make repairs nor can we say that the court below was in error in holding that the City had not assumed control of the equipment for the purpose of maintaining or repairing Car No. 553. The circumstances of the case at bar are substantially different from those which were before us in Quinones v. Township of Upper Moreland, 3 Cir., 293 F.2d 237 (1961).

It must also be pointed out that there is no evidence in the record to prove that the City had knowledge or notice of any defect in the knife switch on Car No. 553, or that it should have had such knowledge, if indeed there was a defective switch on the car.

██ This brings us to the position, which we will treat as implied by the plaintiff's Pretrial Memorandum, that the accident occurred to Wiggins because Car No. 553 and its electrical equipment, at the time of the renewal of the lease on July 1, 1957, was obsolete, old, and therefore dangerous.[8] In support of his posi-

---

6. See note 3, supra.

7. Unreported opinion of the court below on the motions of the plaintiff to take off the directed verdicts and for new trials.

8. We think this is the substance of the plaintiff's position in this court, but the plaintiff has stated his contentions so broadly and so baldly as to leave us in doubt as to his precise position.

In his brief in this court, the plaintiff states: "The City of Philadelphia on July 1, 1957 when.the lease was renewed

tion the plaintiff offered a brochure entitled "Philadelphia Transit Studies", dated October 1955, prepared for the Department of Public Property, City of Philadelphia, by DeLeuw, Cather & Company, Consulting Engineers, Chicago. Some of the background of the report should be stated here. The City was contemplating bringing its transportation facilities up to date, purchasing new cars and other equipment, with the intention of improving its service generally. Reference is made in the report to the cars, of which Car No. 553 was one, and, as indicated by the record, at the time of the accident were approximately 36 years old. At the time of the report the cars were 33 years of age. The court below refused to admit the report as an exhibit by the plaintiff. There was evidence received in the record or proffered that the life expectancy of the cars was 35 years. There was also evidence received or to the effect that 40 or 45 years might constitute their useful life. There is a statement in the Transit Study that "inspection and repair schedules and procedures covering both car equipment and bus equipment were found to be generally satisfactory * * *."

The term "Obsolete" is defined by "The New Century Dictionary" as "Fallen into disuse or no longer in use. * * *" The same authority defines "Obsolescent" as "Becoming obsolete; passing out of use * * *." The term "Obsolete" is a term usually employed in bookkeeping to determine values apart from physical deterioration which causes elements of a plant as a whole to suffer diminution in value. See Union Tank Car Co. v. Louisiana Oil Refining Corporation, 184 La. 121, 165 So. 638 (1936). "Obsolescence" has been described by the Supreme Court as "the condition or process by which units gradually cease to be useful or profitable as a part of the property, on account of changed conditions." Burnet v. Niagara Falls Brewing Co., 282 U.S. 648, 51 S.Ct. 262, 75 L.Ed. 594 (1931). But the difficulty in trying to maintain the position which we have indicated the plaintiff might be deemed to have taken by implication is that it does not follow that because machinery is old it is unsafe. So long as the clips were tight the main switch was safe. The report was properly excluded from evidence as was the related evidence given or proffered as not germane to the issue of negligence. To assert, as does the plaintiff, that the City knew or should have known at the renewal of the lease that the switch would periodically become loose and fall and to hold it liable on this ground, is to argue obliquely a defective design in the electrical equipment of Car No. 553 at the time of the renewal of the lease on July 1, 1957. This, as we have indicated, is a position the plaintiff is not entitled to take. In fact the plaintiff's bald assertion that the City knew or should have known on July 1, 1957 that the master switches would periodically become loose, while true, is only a partial truth, for any mechanical device which is subject to vibration will loosen and will require watchful observation and tightening or replacement if accidents are to be avoided. But.

for elevated car # 553, was under the affirmative duty to use reasonable care to determine if the elevated car was reasonably safe for its intended use * * * Certainly the jury could reasonably find the City knew or should have known on July 1, 1957 the clips holding the knife switch would periodically become loose and the knife switch would fall and that this made elevated car # 553 unsafe. In 1922 and in July, 1957, the City of Philadelphia supplied a chattel, elevated car # 553, for the P.T.C. to use for a proprietory purpose of the City. The City failed to make the chattel safe. Under Sec. 392 of the Restatement of Torts, the City is liable." We do not consider this argument for the reasons hereinbefore stated in this opinion insofar as it may relate to defective design but if the statement, "Certainly the jury could reasonably find the City knew or should have known on July 1, 1957 [the date of the renewal of the lease] the clips holding the knife switch would periodically become loose and the knife switch would fall and that this made elevated car # 553 unsafe.", be treated in terms of aging or obsolescent equipment, it should be discussed.

there is nothing in the record to indicate that the knife switch on any of the hundred cars, Car No. 553 included, was loose or worn out at the time of the renewal of the lease on July 1, 1957.

■ Even if the plaintiff had shown an unsafe condition in the electrical equipment of Car No. 553 on July 1, 1957, he still would have had the burden of showing that no change of condition took place between July 1, 1957 and the time of the occurrence of the accident on October 11, 1958. See Wigmore (3rd ed.) Section 456, p. 463. Compare Johns v. Pennsylvania R. R. Co., 226 Pa. 319, 75 A. 408, 28 L.R.A.,N.S., 591 (1910). This he has not done. The plaintiff's position is in substance a charge that the City failed to keep the electrical equipment on Car No. 553 in proper repair, a failure to perform a duty which, as we have seen, was imposed as a matter of law on P.T.C. To sum up, the plaintiff has failed to sustain the charge that the accident occurred because the City's equipment was obsolete or defective on July 1, 1957.

■ The court below went further in its opinion and stated in footnote 1, cited to the text, the following: "A careful review of the record fails to disclose to us now, as was the case at trial, any reliable evidence upon which a jury could find what did cause this explosion."[9] The statement quoted is correct. A jury, under the circumstances at bar, would be required to speculate or guess as to the cause of Wiggins' accident. This it may not do. Lanni v. Pennsylvania R. R. Co., 371 Pa. 106, 110, 88 A.2d 887, 889 (1952).

■ The plaintiff insists that the court below committed reversible error in permitting the third party defendant, P.T.C., to cross examine the plaintiff's witnesses and to participate in the "plaintiff's trial". This contention is based upon the decision in M. V. M., Inc. v. St. Paul Fire and Marine Ins. Co. and United States Lines, 20 F.R.D. 296 (D.C.,S.D.N.Y. 1957), in which the court ruled on the question of whether a third party defendant had the right to serve interrogatories upon the plaintiff under Rule 33, Fed.R. Civ.Proc., 28 U.S.C. The decision of Judge Dimock in this case turned largely upon the fact that the third party defendant had served no answer but had "remained aloof from the controversy between plaintiff and defendant". In the case at bar, however, P.T.C. filed an answer to the third party complaint and we are concerned with the application of Rule 14(a) and not with Rule 33. A fair reading of Rule 14(a) indicates clearly that since the third party defendant may be liable to the original defendant, the third party defendant must be permitted to take part in the trial and conduct examinations and cross examination as the rules of evidence permit. Otherwise, two trials in effect would have to be conducted, causing a senseless waste of time of jurors, of witnesses, attorneys and of judges. This issue was correctly ruled upon by the court below in Weitort v. A. H. Bull & Company, D.C., 192 F.Supp. 165 (1961). Cf. Howey v. Yellow Cab Co., 181 F.2d 967, 973 (3 Cir. 1950). See 4 Moore's Federal Practice, Par. 33.06, note 4, criticizing the ruling on the point involved in the decision in Harlan Produce Co. v. Delaware L. & W. R. Co., 8 F.R.D. 104 (D.C.W.D.N.Y.1948).

Other issues raised by the parties do not require discussion.

The judgment of the court below will be affirmed.

---

9. In its supplemental appendix the plaintiff printed the opinion of the court but failed to print this very cogent footnote.