William J. KERNAN, Administrator of the Estate of Arthur E. Milan,

v.

GULF OIL CORPORATION.

John H. MEEHAN, Administrator of the Estate of Donald H. Worrell,

v.

GULF OIL CORPORATION.

Civ. A. Nos. 15908, 16001.

United States District Court
E. D. Pennsylvania.

June 30, 1964.

Freedman, Landy & Lorry, Milton M. Borowsky, Philadelphia, Pa., for plaintiffs.

John B. Hannum, Philadelphia, Pa., for defendant.

KRAFT, District Judge.

On the evening of November 18, 1952, shortly after 10:00 o'clock, the tug Arthur N. Herron was proceeding downstream in the Schuylkill River, with a tow consisting of a loaded mud scow made up on her port side. As she was approaching the Penrose Avenue Bridge, the tug was suddenly enveloped in flames, and portions of it, including the entire wheelhouse, were destroyed. Two members of the crew, Milan and Worrell, lost their lives.

The American Dredging Company, owner of the tug, filed a petition in this Court for exoneration from or limitation of liability. The Court, in an opinion by Chief Judge Kirkpatrick, held that the petitioner was entitled to exoneration. In Re Petition of American Dredging Co., 141 F.Supp. 582 (E.D.Pa.1956). The Court of Appeals, Chief Judge Biggs dissenting, affirmed. A majority of the Court denied a petition for rehearing. 235 F.2d 618 (3rd Cir. 1956). The Supreme Court reversed and remanded the case for further proceedings. Kernan v.

American Dredging Co., 355 U.S. 426, 78 S.Ct. 394, 2 L.Ed.2d 382 (1958).

On July 7, 1958, following a trial on the issue of damages, this Court, by Judge Kraft, entered judgment in favor of claimant William J. Kernan, Admr. Est. of Arthur E. Milan, in the sum of $37,500, and in favor of claimant John J. Meehan, Admr. Est. of Donald H. Worrell, in the sum of $90,000, and against petitioner American Dredging Company.

The administrators also instituted the present actions in 1953 against Gulf Oil Corporation (Gulf), under the Pennsylvania Wrongful Death and Survival statutes. Following a trial in 1961 before Judge Wood and a jury on the issue of liability which resulted in verdicts for plaintiffs, the Court held that the evidence was insufficient to establish liability on the part of Gulf. Accordingly, Judge Wood granted Gulf's motion for judgment n. o. v., and granted, alternatively, its motion for a new trial in the event that the entry of judgment n. o. v. was reversed on appeal. Kernan v. Gulf Oil Corporation, 201 F.Supp. 117 (E.D. Pa.1961). On appeal, the Court of Appeals reversed the judgment n. o. v., but sustained the grant of a new trial. Meehan v. Gulf Oil Corporation, 312 F.2d 737 (3rd Cir. 1963).

On remand of the record, the cases were tried on the issue of liability before Judge Kraft and a jury. Following verdicts for the defendant, the plaintiffs filed the present motions for judgment and for a new trial.

Plaintiffs' first contention is that the verdicts were against the weight of the evidence. The evidence was so thoroughly reviewed in Judge Wood's opinion, as well as in the opinion of the Court of Appeals, on appeal, that we deem it unnecessary to review the evidence in minute detail. Moreover, the Court of Appeals indicated that the facts were for the jury. 312 F.2d 727, at 739.

We have already stated that on the evening of November 18, 1952, the tug was proceeding downstream in the Schuylkill with a loaded scow lashed to her port side. The scow carried open-flame kerosene lanterns on her port forward and aft corners. Witnesses testified that shortly after 10 o'clock, as the tug was approaching Penrose Avenue Bridge, they heard a rumbling sound as of thunder, and almost instantly the tug was engulfed in flames. Five men went over the side. Milan apparently drowned in the attempt to reach shore. No trace was ever found of Worrell.

Gulf's refinery was located on the east side of the river, a short distance downstream from the Penrose Avenue Bridge. It is plaintiffs' theory that gasoline or other highly inflammable products escaped from Gulf's premises to form a "slick" on the surface of the water and that the fire was caused by ignition of such substance or of the vapors therefrom. There was evidence that during a period of time preceding the fire, tankers and barges were loading and unloading gasoline and other petroleum products at Gulf's premises. There was also evidence of discrepancies between the amounts shown to have been pumped from the shore tanks and the amounts shown to have been received on board the tankers or barges. Defendant offered various explanations for these shortages. Crew members of one of these barges testified that they detected a strong odor of gas; that they turned their flashlights on the river and saw a mass of it; that "it was all colors of the rainbow in the water".

An Assistant Fire Marshal of Philadelphia, who inspected the tug the day following the fire, stated that in his opinion an open flame lantern on the scow ignited a gasoline slick on the river, causing the fire.

Plaintiffs' expert witness, in answer to a hypothetical question covering ten pages of the trial transcript, testified that in his opinion a very volatile material, such as gasoline, caused the fire, and that it came from the Gulf docks. The witness reached this conclusion on the basis of an involved series of calculations covering many pages of the tran-

script. He stated it as his conclusion "that the tug and the fuel [diesel] that it carried could not possibly account for the fire that was had".

Defendant contended, on the other hand, that the fire originated on the tug, that its diesel fuel became ignited in some fashion, and that gasoline had no part in causing the fire. Defendant's expert witness stated in response to a hypothetical question:

"My opinion is that the day tank overflowed and that it saturated the superstructure and that it was ignited by three probable sources of ignition; one, the galley stove that was in operation; the exhaust from the main diesel engine, and a third probable cause would be the open flame lanterns on the scow."

The witness discounted the possibility that the fire was caused by ignition of gasoline on the water:

"It was just impossible to have quantities of gasoline on the water, have it spread rapidly, and have it not flash back to the source. It is incredible. It just doesn't happen."

The evidence was lengthy, involved and highly conflicting. In our view, the questions were clearly for the jury. Basic to the arguments on both sides, is the erroneous assumption that the jury was obliged to accept, *in toto,* the one version or the other. The jury was free, of course, to find any facts adequately supported by the evidence. It could have found that the fire was caused by the ignition of inflammable material in the water, but that the material did not originate at the Gulf premises; or that it was not persuaded by a fair preponderance of credible evidence what caused the fire.

We find devoid of merit plaintiffs' contention that the verdicts were so contrary to the weight of the evidence as to require a new trial.

Plaintiffs' next complaint is that the trial judge erred in what plaintiffs now term his "restriction" of the examination of the witness Taylor.

Plaintiffs called James M. Taylor, captain of the tug at the time of the fire. In the direct examination of this witness the following question and answer appear:

"Q Were you aware of any presence of fumes at that time just before the accident or around the time of the accident?

"A Nothing unusual, no."

Plaintiffs' counsel then called the witness' attention to certain testimony he had given during a Coast Guard investigation a few days after the fire. When counsel requested the witness to look at certain questions and answers in his former testimony, the trial judge inquired whether it was intended to be shown for the purpose of refreshing the witness' recollection. Counsel replied in the affirmative. The trial judge stated that for that purpose it might be shown the witness. After the witness had read his earlier testimony, the trial judge inquired whether it refreshed his recollection. The witness answered that it did not. Following a colloquy between counsel and the trial judge, counsel then offered in evidence certain portions of the witness' former testimony. Defendant objected, and the trial judge ruled:

"We will sustain the objection for the present. If counsel can furnish us with controlling decisions which indicate their admissibility, we may then and only then reverse our ruling, and in that event they may be read to the jury."

Plaintiffs contend that the trial judge erred in his ruling. Counsel now submits equivocal argument about the purpose of his offer and the reason for the trial judge's ruling. His brief speaks of *confronting* Taylor with his prior testimony. Taylor's former answers were never offered for the purpose of contradiction or impeachment. They were offered as *substantive evidence* of the matters therein asserted. We know of no authority which would permit their admission for that purpose. Johnson v. Baltimore & O. R. Co., 208 F.2d 633

(3rd Cir. 1953), is inapposite. That case held merely that in a wrongful death action against the railroad for the fatal shooting of plaintiff's decedent by a railroad policeman, although plaintiff called the policeman as a witness, plaintiff was not bound by everything the policeman said. The case definitely did not hold that, where a witness' recollection was not refreshed by his earlier testimony in a different proceeding to which the present defendant was not a party, such testimony could be received, over defendant's objection, as substantive proof of the matters asserted. The other authorities cited by plaintiffs are likewise not in point. We conclude that the trial judge's ruling was not erroneous.

■ Plaintiffs' next complaint is that the trial judge erred in overruling their objection to the hypothetical question *directed to defendant's expert witness on direct examination.* They assert that the question was "tactically valueless and likely to mislead the jury". (The words quoted from plaintiffs' brief are a paraphrase from language in § 682, Wigmore on Evidence, and the word is "practically"—not "tactically"). Plaintiffs' complaint appears to be that defendant culled certain assumed facts having a bearing particularly favorable to defendant's side. See Wigmore, § 682. However, plaintiff overlooks the following from the same section of Wigmore:

> "The question, on principle, *need not include* any particular number of facts; i. e. it may assume any one or more facts whatever, and *need not cover all the facts which the questioner alleges* in his case. The questioner is entitled to the witness' opinion on any combination of facts that he may choose. \* \* \* For reasons of principle, then, and to some extent of policy, the natural conclusion would be that the questioner need not cover in his hypothesis the entire body of testimony put forward on that point by him or by the opponent, but may take as limited a selection as he pleases and obtain an opinion on that

basis. Such is the orthodox doctrine as applied by most Courts."

"A hypothetical question rarely encompasses the assertions of both the proposing and the opposing parties." Battistone v. Benedetti, 385 Pa. 163, 169, 122 A.2d 536, 539 (1956). In Gillman v. Media, Etc., E. Ry. Co., 224 Pa. 267, 274, 73 A. 342, 344 (1909), it is stated:

> "The objection to the question put to the expert witness was 'that it does not state all of the facts of the case.' It, however, did state all of the facts disclosed by the evidence in the case from the standpoint of the party interrogating the witness, and that was all that is required. Coyle v. Com., 104 Pa. 117; Davidson v. State, 135 Ind. 254, 34 N.E. 972; Cowley v. People, 83 N.Y. 464; Stearns v. Field, 90 N.Y. 640. In the Coyle case, Mr. Justice Clark, speaking for the court, said ([104 Pa.] page 133): 'Each side had the right to an opinion from the witness upon any hypothesis reasonably consistent with the evidence, and, if meagerly presented in the examination on one side, it may be fully presented on the other; the whole examination being within the control of the court, whose duty it is to see that it is fairly and reasonably conducted.' Coffey, J., delivering the opinion in the Davidson Case, says (page 261 of 135 Ind., page 974 of 34 N.E.): 'In the examination of expert witnesses, counsel may embrace in his hypothetical question such facts as he may deem established by the evidence, and, if, opposing counsel does not think all the facts established are included in such question, he may include them in questions propounded on cross-examination. Any other course would result in endless wrangles over the question as to what facts were, and what were not, established.' In Stearns v. Field it is held that: 'If testimony of an expert is proper, counsel may ask a hypothetical question, assuming the existence of any

344

state of facts which the evidence fairly tends to justify. An error in the assumption does not make the interrogatory objectionable, if it is within the possible or probable range of the evidence.' "

The authorities relied on by plaintiffs are inapposite, and we find no merit in their contention.

■ Plaintiffs next contend that, "The Court failed to provide sufficient legal guideposts to aid the jury in rationally reaching its decision."

It is significant to note at the outset that when the trial judge asked counsel whether they had any exceptions to the charge, plaintiffs' counsel stated: "I don't think I am going to raise any exceptions, your Honor." In Sowizral v. Hughes, 3 Cir., 333 F.2d 829 (June 19, 1964), the Court of Appeals of this Circuit stated:

"Rule 51 of the Federal Rules of Civil Procedure does not require strict formality in the manner or mode in which the party objects to an alleged error in a charge. But it does require that the party make his position clear so that he informs the trial judge of possible error. Only by so doing this does the party afford the court opportunity of correcting any possible error."

Plaintiffs' objections are, we think, without merit. As to the duty of care resting on defendant, plaintiffs refer us to Fredericks v. Atlantic Refining Co., 282 Pa. 8, p. 13, 127 A. 615, p. 616, 38 A.L.R. 666 (1925), in which the Court stated:

"A higher degree of care is required in dealing with a dangerous agency than in the ordinary affairs of life or business, which involve little or no risk. No absolute standard can be fixed by law, but every reasonable precaution suggested by experience and the known danger ought to be taken."

Plaintiffs imply that the trial judge should have used that precise language in its charge. The trial judge emphasized the fact that the standard of care varies according to the circumstances, and left it to the jury to determine what standard of care a reasonable, prudent person would adopt in the circumstances they find to have existed:

"You will note then that the standard of care of a reasonable, prudent person depends, as it should, on circumstances. Where circumstances involve the use of harmless substances, the standard of care of a reasonable, prudent person may be substantially different from the standard of care of the same reasonable, prudent person where the circumstances involve the use of a substance susceptible of causing harm.

"As an illustration, and as an illustration only, if we were to leave for safekeeping with the well known reasonable, prudent person a lump of coal, a valuable diamond and a stick of dynamite, might we not expect reasonably varying degrees of care to be used in respect of each of the objects consistently with the characteristics and propensities of the substance involved?

"The plaintiff here contends that the defendant should have used the highest degree of care in the handling of its petroleum products because the characteristics and propensities of such products would, as the plaintiff contends, impel a reasonable, prudent person to use the highest degree of care. It is for you to determine what standard of care a reasonable, prudent person would adopt under the circumstances that you find from the evidence existed here and apply that standard of care to the defendant and to its acts and omissions, if any there be, in your determination of whether the defendant did or did not use reasonable care under the circumstances."

The instructions were in accordance with the law of Pennsylvania. In Foster v. Sol Greisler & Sons, Inc., 150 Pa.

Super. 509, p. 511, 29 A.2d 103, p. 105 (1942), President Judge Keller stated:

> "In a negligence case the function of the jury is not merely to determine the basic facts upon conflicting evidence; it is the jury's function to determine the appropriate rule of conduct for the particular circumstances found to have existed."

We have found no case to the contrary, and have been referred to none. The Court did not indicate in Fredericks, supra, that the trial judge was bound to *charge the jury* as stated in the opinion.

■ Plaintiffs further contend that the trial judge erred in his refusal to charge on the question of public nuisance. They argue that gasoline escaped into the river during the loading and unloading operation at the Gulf docks; that this escape constituted a public nuisance; that the ignition of this gasoline caused the fire; and that they suffered special damage from this public nuisance, which entitles them to a recovery on that ground, apart from any question of negligence.

Both complaints charged Gulf with negligence, and negligence alone. Plaintiffs' pre-trial memorandum, filed November 28, 1958 (Document No. 11), based their claims solely on negligence. Plaintiffs' motions to amend their pretrial memorandum, filed April 11, 1961 (Document No. 38), was for the sole purpose of including names of additional witnesses. On August 1, 1963, less than two months before the present trial, plaintiffs filed another motion to amend their pre-trial memorandum to include names of additional witnesses (Document No. 50). In none of these papers was there any hint that plaintiffs pitched their claim on any ground other than negligence. We find no mention in the transcript of the pre-trial conference or in the colloquy which comprised the pre-trial order of any claim of public nuisance as a basis for liability. That that issue was therefore foreclosed to

plaintiffs is settled by the ruling of the Court of Appeals in Wiggins v. City of Philadelphia, 331 F.2d 521, 526 (3rd Cir. 1964), Adv. Rep. June 22, 1964:

> "Neither in his pleading nor in his Pretrial Memorandum nor in the colloquy which comprised the pretrial order did the plaintiff employ the word 'design' or any similar term. To have permitted him to have asserted a new position by claiming deficiency in design would impair the efficacy of the pretrial conference procedure and would have been manifestly unfair to the City. The trial judge ruled correctly in excluding evidence based on such a theory. The issue is foreclosed to the plaintiff in this court also, although he has attempted to argue it here."

Moreover, before the summations of counsel, plaintiffs' counsel expressly stipulated[1] that liability was sought to be imposed only upon the basis of negligence and upon the applicable provisions of the Pennsylvania Act of June 22, 1937, P.L. 1987, as operative on November 18, 1952 and as borrowed by the admiralty law.

■ Entirely apart from these considerations, however, the evidence, viewed most favorably for plaintiffs, was insufficient, we think, to support a finding of a public nuisance, for the evidence could have established at best an *involuntary* action on defendant's part, i. e., an accident. A public nuisance is a crime. 66 C.J.S. Nuisances § 2, p. 732. Involuntary actions are not criminal. 22 C.J. S. Criminal Law § 30 p. 106. An excellent discussion of the principle is found in State v. American Agr. Chemical Co., 118 S.C. 333, 110 S.E. 800, 802 (1922). The authorities on the point are unanimous. See, People v. Anderson, 210 App. Div. 59, 205 N.Y.S. 668, 679 (1924); Hornstein v. Paramount Pictures, 37 N. Y.S.2d 404, 413 (Sup.Ct., Spec.T.1942) ([N]o statute ever attempted to make involuntary action a crime"); State v.

1. Transcript of stipulation, Document 72, pp. 2, 3.

Fulco, 194 La. 545, 194 So. 14, 17 (La. 1940); Mansur v. Lentz, 201 Mo.App. 256, 211 S.W. 97, 98 (1919); Com. v. Unkrich, 142 Pa.Super. 591, 597, 16 A.2d 737 (1940); Reynolds v. Rolinson, 8 Pa.Dist. & Co. 8, 16 (1925).

Plaintiffs' reliance on Com. v. Sonneborn, 164 Pa.Super. 493, 66 A.2d 584 (1949), is misplaced. In that case, a prosecution under the Act of June 22, 1937, P.L. 1987, as amended, 35 P.S. § 691.1 et seq., for illegally discharging industrial waste into public waters, the Court stated that "the defendants' intent is wholly immaterial". However, the Court was dealing with a voluntary— even intentional act—and not with an accidental act. Similarly, Com. ex rel. Shumaker v. New York & Pa. Co., 367 Pa. 40, 79 A.2d 439 (1951), assumes volition on defendant's part.

For these reasons we conclude that the trial judge properly declined to submit to the jury the question of liability based on public nuisance.

■ Plaintiffs' final complaint is that the trial judge "erroneously interjected (sic) the issue of preemption." Their strictures in this connection are wholly unwarranted and present a distorted view of the situation. In a situation in which counsel indicated to the Court that both federal and state legislation might be applicable, it was scarcely error for the trial judge to inquire in a conference with counsel whether either contended for, or had given thought to the question of, possible federal preemption of the field.

At the close of the testimony, the trial judge suggested to counsel that they give some expression to their views on the question of the applicable law— whether federal, state, or both. The trial judge met with counsel, in chambers, after the trial session on October 3, 1963 and heard the conflicting and, in some respects, uncertain views of counsel on the question. This conference ended with a suggestion by the trial judge that counsel engage in further research overnight and meet with the trial judge in chambers on the following morning to advise the trial judge whether additional thought and research resulted in reconciliation of their viewpoints to any degree. Counsel met with the trial judge in chambers on the morning of October 4th and after further brief discussion, counsel entered into a stipulation which was then recorded at the direction of the trial judge.[2]

Plaintiffs' counsel, inter alia, expressly waived any right to claim to recover under any provisions of the Oil Pollution Act of 1924, 33 U.S.Code, § 131 et seq., or under 33 U.S.Code, § 407, or under any other federal legislation. Defendant's counsel expressly waived any claim that any applicable provision of any applicable Pennsylvania statute was inoperative because of federal preemption of the field. Contrary to plaintiffs' present assertion, the trial judge did not "request" any stipulation, and no legitimate purpose is served by misrepresentation of fact.

The duty of the trial judge to instruct the jury on the law is of immemorial antiquity, and it seems only normal and natural for the trial judge to obtain counsels' view of the applicable law, particularly in litigation which has had such a long and tortuous history.

We conclude, after careful consideration, that the reasons assigned in support of plaintiffs' motions are without merit, and accordingly make the following

## ORDER

Now, June 30th, 1964, it is ordered that:

1. Plaintiffs' motion for judgment in accordance with their point for binding instruction be, and it is, denied.

2. Plaintiffs' motion for a new trial be, and it is, denied.

2. Document 72.